925 P.2d 797

STATE of Hawai'i, Plaintiff–Appellee,

v.

Emil R. PULSE, Defendant–Appellant.

No. 16726.

Supreme Court of Hawai'i.

Sept. 17, 1996.

As Amended Sept. 23, 1996.

As Amended on Partial Grant of
Reconsideration Oct. 14, 1996.

Richard T. Pafundi, on the briefs, Honolulu, for defendant–appellant.

Caroline M. Mee, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff–appellee.

MOON, C.J., KLEIN, LEVINSON and RAMIL, JJ., and TOWN, Circuit Judge in place of NAKAYAMA, J., recused.

KLEIN, Justice.

Defendant–Appellant Emil R. Pulse was convicted of violating Hawai'i Revised Statutes (HRS) §§ 134–6(a) and 134–6(b).[1] For the reasons set forth below, we (1) reverse Pulse's HRS § 134–(6)(a) conviction and sentence and (2) vacate and remand Pulse's HRS § 134–6(b) conviction and sentence for proceedings consistent with this opinion.

## I. BACKGROUND

On February 27, 1991, a complaint was filed in the circuit court charging Pulse with one count of violating HRS § 134–6(a), one count of violating HRS § 134–6(b), and two counts of terroristic threatening, in violation of HRS § 707–716(1)(d) (1993).[2] The circuit

---

1. At the time of the incident giving rise to the charges in the instant case, HRS § 134–6 provided in pertinent part:

(a) It shall be unlawful for a person to knowingly possess or intentionally use or threaten to use a firearm while engaged in the commission of a felony, whether the firearm was loaded or not, and whether operable or not.

(b) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

HRS § 134–6 (Supp.1992)

HRS § 134–6 has since been amended. *See* 1993 Haw. Sess. L. Act 239, § 1 at 418; 1994 Haw. Sess. L. Act 204, § 5 at 497–98. The 1993 amendments significantly changed HRS § 134–6(a); however, the legislature expressly provided that the amendment was not to "affect rights and duties that matured, penalties that were incurred, and proceedings that were begun before its effective date [June 18, 1993]." 1993 Haw. Sess. L. Act 239, § 2 at 419.

With respect to HRS § 134–6(b), it has been redesignated as HRS § 134–6(c) (Supp.1995), but is otherwise unchanged.

2. HRS § 707–716(1) provides:

A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

(a) By threatening another person on more than one occasion for the same or a similar purpose; or

(b) By threats made in a common scheme against different persons; or

(c) Against a public servant . . .; or

(d) With the use of a dangerous instrument.

court action was assigned criminal number 91–0467. Count I of the complaint charged:

> On or about the 14th day of February, 1991, in the City and County of Honolulu, State of [Hawai'i], EMIL R. PULSE did knowingly possess or intentionally use or threaten to use a firearm while engaged in the commission of a felony, whether the firearm was loaded or not, and whether operable or not, thereby committing the offense of Possession, Use or Threat to Use a Firearm in the Commission of a Felony, in violation of Section 134–6(a) and (d) of the [Hawai'i] Revised Statutes.

Count II of the complaint charged:

> On or about the 14th day of February, 1991, in the City and County of Honolulu, State of [Hawai'i], EMIL R. PULSE did carry or possess a loaded or unloaded pistol or revolver without a license issued as provided in Section 134–9 of the [Hawai'i] Revised Statutes and did fail to confine said pistol or revolver as required under Section 134–6(b) of the [Hawai'i] Revised Statutes, thereby committing the offense of Place to Keep Loaded Firearm or Pistol or Revolver, a Class B felony, in violation of Section 134–6(b) and (d) of the [Hawai'i] Revised Statutes.

In addition, both of the terroristic threatening counts charged Pulse with "the use of a dangerous instrument, to wit, a firearm." [3]

The incident that gave rise to the charges took place at Keehi Lagoon Harbor. Pulse and his girlfriend, Hai Thi Nguyen (also known as Sandy), lived on a boat that was located on the 600 pier, and an acquaintance of theirs, Steve Cartagena, lived on a boat on the 700 pier. According to the prosecution's theory of the case, after an argument between Pulse and Sandy on the night of February 13, 1991, Sandy had gone to the boat where Cartagena lived. Then, shortly after midnight on February 14, 1991, Pulse boarded Cartagena's boat with a loaded revolver and demanded to see Sandy. Pulse shoved the revolver into Cartagena's abdominal region and threatened to shoot both Cartagena and Sandy. After an exchange of words,

Pulse returned to his boat, where he was later arrested.

On April 15, 1991, Pulse filed a motion to suppress evidence obtained by the police when they boarded his boat, arrested him, and seized a gun located therein. On June 18 and 19, 1991, the circuit court conducted a hearing on Pulse's motion to suppress.

Honolulu Police Department (HPD) Officer Timothy Mariani was the sole witness called by the prosecution. He testified that on February 14, 1991, after receiving a call from Harbor Patrol regarding an incident involving a firearm at Keehi Lagoon Harbor, he proceeded to the harbor. When he arrived, he met with Officer Keith Becker of the Harbor Patrol who informed him that one male (Pulse) had threatened another male (Cartagena) with a firearm and that the suspect was on a boat in slip number 618. The boat located in that slip was registered to Pulse. Officer Mariani walked down the finger pier next to the boat and, with the aid of a flashlight, looked into the cabin. He observed Pulse lying down on a mattress, asleep, and what appeared to be the butt of a handgun next to him. Officer Mariani had "started to point [the handgun] out" to HPD Officer William Lurbe and Officer Becker, who were behind him on the finger pier, when he saw Pulse move. Because he was afraid that Pulse would awake, in order to protect the safety of everyone in the vicinity, he and some of the other officers boarded the boat and seized the handgun. According to Officer Mariani, they did not wake Pulse until after the handgun had been seized. Pulse was then wakened and escorted off of the boat.

After Officer Mariani completed his testimony, Pulse called several of the other officers who had been involved to testify. Officer Lurbe testified that the finger pier was "[m]aybe 30 feet, 25, 30 feet" long and that the boat was longer than the finger pier. Prior to boarding the boat, Officer Lurbe never saw anything inside of the boat. He testified, however, that, while Officer Mariani was standing on the far end of the finger pier, Officer Mariani stated that he could see

---

**3.** Subsequently, on September 6, 1991, the circuit court entered an order granting the prosecu-
tion's motion to Nolle Prosequi the two terroristic threatening counts of the complaint.

a male and a handgun inside the cabin. He further testified that he and Officer Mariani boarded the boat and proceeded to the doorway of the cabin, that Officer Mariani recovered a handgun from the "bed area where [Pulse] was sleeping," and that Pulse did not awake at that time.

Pulse then called Hawai'i State Marine Patrol officer Terry Lyman Gaeta, who testified that she had observed Pulse go onto a boat on the 700 pier and then stagger back towards the 600 pier. She saw Pulse carrying what appeared to be a beer can and did not see anything that appeared to be a weapon. When the HPD officers arrived later, she accompanied them to Pulse's boat. She testified that the length of the finger pier was "[m]aybe about 20, 25 feet at most, maybe a little bit less." She did not walk onto the finger pier but stayed on the main pier near the bow of the boat. While there, she saw the HPD officers standing on the finger pier, shining a flashlight into the boat and looking inside. She also heard one of the officers say that he saw a man who appeared to be sleeping on board and that he saw a gun.

Officer Becker testified that he met up with the HPD officers on the night in question and walked onto the finger pier next to Pulse's boat. While on the finger pier, Officer Becker did not see the handgun, but he did see it after he boarded the boat and was standing on the deck looking into the cabin.

Pulse then sought to have Earl Aku, an investigator from the Public Defender's Office, testify, and the following exchange took place:

> THE COURT: [Defense Counsel], your offer of proof with respect to this witness.
> [Defense Counsel]: Yes, Your Honor. In light of yesterday's testimony, I was very concerned regarding the evidence that came out. Therefore, at 7:30 this morning, my investigator and myself went out to the scene and took photographs. I think it is crucial for the court to have an opportunity to view these photographs and the scene. The boat is at the same slip and at the same location it was on February 14th, 1991. I think it would help or assist the court in its determination as to whether or

not there was actually justification to this warrantless search. And therefore, I have brought my investigator to not only describe, through his testimony, how the pier looks and the finger pier looks out but, also, photographs reflecting the finger pier, the pier, and the vessel itself.

> THE COURT: When you say justification for the warrantless entry, what are you referring to? The ability to see the handgun?
> [Defense Counsel]: Yes, Your Honor. Yes.
> THE COURT: Okay. [Prosecutor]?
> [Prosecutor]: Your Honor, the State does object. [Defense Counsel] tells us it's the same as that early morning. But we have had four people testify as to what they saw that particular morning. And certainly the investigator from the Public Defender's Office is not able to tell the court more than the four people who were there on the morning in question. And we don't know if there are any changes. I mean [Defense Counsel] has said that there are not. But he wasn't there that morning. So we do object to the pictures, Your Honor.
> [Defense Counsel]: Your Honor, I didn't mean to make any representations that there were not any changes. If there is a further foundational requirement regarding whether or not the photos accurately reflect the scene on February 14th, 1991, my client may be able to lay the proper foundation. So any objections regarding that, I would respectfully submit, is premature at this time.
> THE COURT: Okay. Well, while the court finds that it may be helpful, the court would like to just go with the testimony of the witnesses on that night in question. So the court's not going to take additional testimony concerning the photographs or investigation done this morning.
> [Defense Counsel]: Your Honor, can I have a basis on the ruling for refusal to allow this type of evidence. My investigator can describe specifically the length of the finger pier in question at the time. And that is crucial as to whether or not the

officer was actually capable of viewing inside the cabin.

THE COURT: Well, the reason for the ruling is this. We have sufficient testimony or there's been a number of witnesses concerning that issue. And the court finds that there's sufficient evidence for the court to make a ruling based on that information.

Pulse then took the stand himself. He testified that he was the owner of the sailboat that was located at slip 618 on February 14, 1991, and that he lived on the sailboat at that time. Pulse testified as follows regarding the length of the finger pier: "Approximate length, I guess it would only be around 12 feet." Pulse then identified and authenticated eleven photographs that "fairly and accurately depict[ed]" how Pulse's boat and the pier and finger pier next to it looked on February 14, 1991, except that on that date there was a yellow tarp covering part of the boat, "from the mast all the way to the rear of the boat." All eleven photographs were admitted into evidence.

At the conclusion of the hearing, the circuit court orally denied Pulse's motion, and it later entered its written findings of fact, conclusions of law, and order, which provided, in pertinent part:

1. In the late night hours of February 13, 1991 or the early morning hours of February 14, 1991, Steve Cartagena was apparently terrorized by the defendant by the use of a handgun; this information was related to Harbor Patrol, and later to the Honolulu Police Department.

. . . .

3. Officer Mariani while on public property, the finger pier, and with the use of a flashlight, looked inside the defendant's boat. Officer Mariani saw the defendant sleeping inside the boat, and what appeared to be the butt of a gun beside the defendant. Officer Mariani saw the defendant stir. Fearing for the safety of the officers, the defendant, and the public, Officer Mariani decided to board the defendant's boat to get the gun.

4. Officer Mariani's testimony was confirmed by Harbor Patrol Officer Gaeta's and Officer Lurbe's testimony. Officers Gaeta and Lurbe testified that Officer Mariani said "I see the gun" while Officer Mariani was on the finger pier. Both Officers Gaeta and Lurbe testified that Officer Mariani said he saw the gun while he was on the finger pier by the stern of defendant's boat.

5. There was no contrary evidence to the testimony that the sighting of defendant's weapon by Officer Mariani occurred when Officer Mariani was on public property.

6. The question as to whether the finger pier was 25 feet long or 12 feet long is not sufficient to raise a specter of reasonable doubt regarding the credibility of Officer Mariani.

. . . .

9. There was probable cause to search plus exigent circumstances and the recovery of the defendant's gun was proper.

On July 10, 1991, Pulse filed a motion for reconsideration or in the alternative to reopen the hearing on the motion to suppress. An affidavit in support of the motion further detailed the testimony that Aku could provide, as follows:

a. He is an investigator for the Office of the Public Defender.

b. That he took numerous photographs of the scene where the alleged incident took place.

c. That he measured the length of the finger pier where Officer Mariani allegedly saw the defendant on February 14, 1991.

d. That the finger pier was 16 feet from end to end, up to and including the main pier.

e. That the photographs were taken from both ends of the finger pier.

f. That Mr. Aku was unable to view within the cabin area of defendant's boat from any position of the entire finger pier.

g. That Mr. Aku would testify that it would be virtually impossible for anyone to see within the cabin area of defendant's boat by standing on the fingerpier.

On July 17, 1991, the circuit court held a hearing on Pulse's motion for reconsideration. With respect to the photographs the

court stated: "Okay, there's already been testimony concerning the photographs from the defendant when he took the stand." The court later reiterated: "[W]ith respect to the photographs that Mr. Aku would have been able to testify to, there's already been sufficient testimony from the defendant himself concerning these photographs as to various locations." With respect to the length of the finger pier, the court stated: "[W]ith respect to the offer of proof that Mr. Aku would be able to testify that the pier was only 16 feet from end to end, there's already been testimony by the defendant that it was actually 12 feet. So this evidence has already been also considered."[4] With respect to the remainder of Aku's proffered testimony, the court stated:

Finally, with respect to the testimony that Mr. Aku would have been able to provide, which is that virtually no one can see within this cabin area unless they are standing on the water, it would just raise an issue of credibility. And, again, this has to do with the person's ability—one particular person's ability to see, Officer Mariani, in the night in question. And Mr. Aku apparently has not been at the scene during the evening hours so that he would be able to make that statement with respect to the conditions at night as opposed to during the day.

On January 8, 1992, Pulse filed a motion to dismiss Count I of the complaint because it did not identify the underlying felony charged in the HRS § 134–6(a) count of the indictment. After a hearing, the circuit court denied the motion to dismiss, but directed the prosecution to file a bill of particulars identifying the underlying felony. On March 10, 1992, a bill of particulars was filed, which stated: "In Count I the Defendant was engaged in the commission of a felony, to wit, Terroristic Threatening in the First Degree."

On May 6, 1992, Pulse filed another motion to dismiss Count I, this time based on the prosecution's failure to identify which type of terroristic threatening in the first degree it was alleging that Pulse committed.[5] After a hearing, the circuit court entered an order denying the motion but ordering that another bill of particulars be filed. On August 6, 1992, the prosecution filed an amended bill of particulars, which stated:

In Count I the Defendant was engaged in the commission of an offense, to wit, Terroristic Threatening in the First Degree, by threats made in a common scheme against different persons; *or* with the use of a dangerous instrument.

(Emphasis in original.)

On August 19, 1992, the circuit court entered an order dismissing the case without prejudice for violation of Hawai'i Rules of Penal Procedure (HRPP) Rule 48.[6] Pulse had requested, in his motion to dismiss, that the case be dismissed with prejudice. The court ruled otherwise, stating:

The charge involves a Class A felony. This is the most serious level of felony. In addition, the conduct here charges assaultive behavior with a firearm. The record does not indicate that the State sought to delay the trial herein. Under these circumstances, reprosecution would not be adverse to the administration of justice. Therefore, dismissal will be without prejudice.

Shortly thereafter, on August 27, 1992, an indictment was filed charging Pulse with one count of violating HRS § 134–6(a) and one count of violating HRS § 134–6(b). A new criminal number was assigned—criminal number 92–2575. Count I of the indictment charged:

On or about the 14th day of February, 1991, in the City and County of Honolulu, State of [Hawai'i], EMIL R. PULSE did

---

4. In its written order denying Pulse's motion for reconsideration, the circuit court indicated that "sufficient testimony has been offered to establish the length of the pier to be twelve feet."

5. HRS § 707–716(1) identifies four different ways in which a person can commit terroristic threatening in the first degree. *See supra* note 2.

6. HRPP Rule 48 mandates the dismissal of criminal charges if a trial on those charges does not commence within one hundred eighty non-excludable days from the time of the arrest or of filing of charges, whichever is sooner. *See State v. Jackson,* 81 Hawai'i 39, 50, 912 P.2d 71, 81 (1996).

knowingly possess or intentionally use or threaten to use a firearm while engaged in the commission of a felony, to wit, Terroristic Threatening in the First Degree, by threats made in a common scheme against different persons, and with the use of a dangerous instrument, whether the firearm was loaded or not, and whether operable or not, thereby committing the offense of Possession, Use or Threat to Use a Firearm in the Commission of a Felony, in violation of Section 134–6(a) and (d) of the [Hawai'i] Revised Statutes.

At a hearing on September 4, 1992, the circuit court set Pulse's trial for the week of September 14, 1992. Pulse's attorney made the following representations at that time:

> I want to assure the Court from day one that we had no desire to unduly continue this matter. . . . So we are going to be ready to go to trial.
>
> . . . .
>
> I haven't even seen the indictment. I know one thing, I think there is going to be—there is going to be a couple of issues and one of them is, I understand they predicate a felony and a threat, he threatened two people and the status is pursuant to a plan or scheme. I don't know if they got that in the indictment. They may be issues that I can't—
>
> . . . .
>
> I don't know if the defense can be ready that fast to go to trial and not have to waive all kinds of rights.

Prior to trial, Pulse made a motion for a continuance. A hearing on the motion was held on September 15, 1992. Defense counsel represented that a continuance was required to allow Pulse to conduct a factual investigation of the incident giving rise to the charges and to make motions, inter alia, to suppress evidence and to dismiss Count I of the indictment. The circuit court denied the

motion to continue, ruling in pertinent part as follows:

> 2. The Court finds that this case can proceed to trial without further delay because:
>
> . . . .
>
> b. Based upon representations of counsel, the motion to suppress the gun is no different than the one previously ruled on in Cr. No. 91–0467; therefore, the Court will authorize the trial judge to hear the motion to suppress only on the basis of new evidence.
>
> > c. The trial judge may exercise its discretion to hear the motion to dismiss Count I; however, it may do so only on issues not previously heard by [the court]; and if there is disagreement as to what those issues are, the trial judge will make that determination.

The next day, Pulse filed a motion in limine in open court in which he essentially sought (1) to have Count I of the indictment dismissed and (2) to have the gun and any reference thereto suppressed. After hearing arguments from counsel, the circuit court denied both aspects of the motion in limine.

At the hearing, Pulse requested that the prosecution turn over photographs that had been taken by the police at the time of the incident. The prosecution represented that the photographs had not been developed prior to the original suppression hearing and that once they had been developed, counsel could have obtained them directly from the HPD through the "standard procedure." Pulse's attorney was then given the opportunity to examine the photographs during the following recess. After examining the photographs, Pulse again moved to reopen the suppression issue based on what the photographs showed and based on alleged prosecutorial misconduct in failing to produce the photographs prior to the original suppression hearing.[7] The court denied the motion.

---

7. Early on, prior to the suppression hearing, Pulse had made a general discovery request for the prosecution to provide, inter alia, "[a]ll books, papers, documents, *photographs*, or tangible objects that the [prosecution] intends to introduce for any purpose[,]" as well as "[a]ll discoverable materials not within the prosecutor's possession pursuant to [Hawai'i Rules of Penal Procedure] rule 16(b)(3)." (Emphasis added.) Apparently no photographs were provided at that time.

Then, after the suppression hearing, on May 22, 1992, Pulsed filed a motion to compel production of, inter alia, "[c]opies of photos of the scene of the alleged crime taken by the police." On July 23, 1992, the prosecution filed a re-

The case then proceeded to trial. After all of the evidence was received, the circuit court instructed the jury on the law to be applied. The jury was instructed that, in order to convict Pulse of the HRS § 134–6(a) charge, the prosecution was required to prove beyond a reasonable doubt, inter alia, that Pulse was "engaged in the commission of a felony." The jury was then instructed that terroristic threatening in the first degree as defined under HRS § 707–716(1)(d)—i.e., terroristic threatening "[w]ith the use of a dangerous instrument"—was a felony offense. The jury was not instructed with respect to terroristic threatening in the first degree under HRS § 707–716(1)(b)—i.e., terroristic threatening "[b]y threats made in a common scheme against different persons[.]"

On September 21, 1992, the jury returned verdicts of guilty as charged on both counts of the indictment. On December 3, 1992, the circuit court entered judgment, sentencing Pulse to a twenty-year indeterminate term for the HRS § 134–6(a) conviction and a ten-year indeterminate term for the HRS § 134–6(b) conviction, the two terms of incarceration to be served concurrently. Pulse thereafter filed a timely notice of appeal.

## II. *DISCUSSION*

Although we ultimately dispose of this case based on our holding in *State v. Ganal*, 81 Hawai'i 358, 917 P.2d 370 (1996), and what transpired during the suppression hearing, we address all other issues presented by Pulse for the purpose of providing guidance and assistance in the event of a retrial.

A. *Pursuant to our holding in State v. Ganal, Pulse's conviction under HRS § 134–6(a) must be reversed.*

In *Ganal*, 81 Hawai'i at 373, 917 P.2d at 385, we discussed the applicability of the

version of HRS § 134–6(a) that was applicable at the time of the incident giving rise to the charges in the instant case:

> [B]ased on established rules of statutory construction, the language of HRS § 134–6(a), particularly when read together with the remainder of Act 195, and the subsequent legislative history, we hold that HRS § 134–6(a) does not apply where the defendant's use of a firearm establishes an element of the underlying felony.

> In the instant case, the underlying felony alleged was terroristic threatening in the first degree against Mabel Ganal under HRS § 707–716(1)(d). One of the elements of HRS § 707–716(1)(d) is that the terroristic threatening at issue was committed "[w]ith the use of a dangerous instrument." The record reveals that the only dangerous instrument allegedly involved was a gun. Thus, it is evident that Ganal's use of a firearm established an element of the underlying felony. HRS § 134–6(a) is consequently inapplicable. Accordingly, we reverse Ganal's conviction[.]

In the instant case, the only underlying felony that the jury could have found that Pulse was committing on February 14, 1991, was terroristic threatening in the first degree in violation of HRS § 707–716(1)(d)—i.e., terroristic threatening committed "[w]ith the use of a dangerous instrument." [8] And, as in *Ganal*, there was no evidence presented that any "dangerous instrument" other than a firearm was involved. Accordingly, under our interpretation of HRS § 134–6(a) as set forth in *Ganal*, *supra*, Pulse's conviction of that offense must be reversed.

Although Pulse did not raise this issue on appeal, we note that "where plain error has been committed and substantial rights have been affected thereby, the error may be noticed even though it was not

sponse to Pulse's motion to compel, which stated, inter alia, that "arrangements have been made with the [HPD] authorizing defense counsel … to request copies of photographs directly from the HPD Photo Lab."

8. The August 27, 1992 indictment had also alleged as an underlying felony for the HRS § 134–6(a) charge that Pulse was committing terroristic

threatening in the first degree "by threats made in a common scheme against different persons." *See* HRS § 707–716(1)(b). However, the jury was not given instructions regarding this felony; the jury was only instructed concerning terroristic threatening in the first degree under HRS § 707–716(1)(d).

brought to the attention of the court." *State v. Schroeder,* 76 Hawai'i 517, 532, 880 P.2d 192, 207 (1994) (quoting *State v. Kelekolio,* 74 Haw. 479, 515, 849 P.2d 58, 75 (1993)); HRPP Rule 52(b) (1994); Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4)(D) (1994) (appellate courts may notice plain error even if not presented as a point of error on appeal).

### B. *The circuit court did not err when it dismissed the charges against Pulse without prejudice.*

Pulse contends that the circuit court erred when, in dismissing the charges against him for violation of HRPP Rule 48, it did so without prejudice. We disagree.

■ Under HRPP Rule 48, the trial court is given the discretion to decide whether the dismissal of a case that is not brought to trial within the allotted time period should be with or without prejudice. The trial court's decision on this matter will not be disturbed unless "there is a clear showing that the trial judge abused his [or her] discretion[.]" *State v. Estencion,* 63 Haw. 264, 269, 625 P.2d 1040, 1044 (1981).

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and the circumstances of the case which led to dismissal; and the impact of a reprosecution on ... the administration of justice.

*State v. Coyaso,* 73 Haw. 352, 355, 833 P.2d 66, 68 (1992) (quoting *Estencion,* 63 Haw. at 269, 625 P.2d at 1044).

■ In the instant case, the circuit court expressly considered the enumerated factors, as follows:

> The charge involves a Class A felony. This is the most serious level of felony. In addition, the conduct here charges assaultive behavior with a firearm. The record does not indicate that the State sought to delay the trial herein. Under these circumstances, reprosecution would not be adverse to the administration of justice. Therefore, dismissal will be without prejudice.

Based on our review of the record, we hold that the circuit court did not abuse its discretion in dismissing the charges against Pulse without prejudice.

### C. *The circuit court did not reversibly err when it denied Pulse's motion for a continuance.*

Pulse next contends that the circuit court erred when it denied his motion for a continuance.

■ "Generally, a request for [a] continuance is subject to the sound discretion of the trial court, and a grant or denial of [a] continuance will not be disturbed on appeal absent a showing of abuse of that discretion." *State v. Ahlo,* 79 Hawai'i 385, 395, 903 P.2d 690, 700 (App.1995) (citing *State v. Lee,* 9 Haw.App. 600, 603, 856 P.2d 1279, 1281, *reconsideration denied,* 9 Haw.App. 660, 861 P.2d 767, *cert. denied,* 75 Haw. 581, 861 P.2d 735 (1993)). "Generally, to constitute an abuse of discretion it must appear that the trial court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Toyomura,* 80 Hawai'i 8, 24, 904 P.2d 893, 909 (1995) (citation, quotation marks, and brackets omitted).

Pulse's primary argument on this issue is that after the August 27, 1992 indictment was filed he should have been allowed to relitigate the suppression motion and raise challenges to the HRS § 134-6(a) count of the indictment, and that he was given insufficient time to do so. We disagree.

■ To begin with, we agree with the circuit court that Pulse was not entitled to relitigate the issues that had already been decided by the circuit court when the case was proceeding under criminal number 91-0467. The purposes of HRPP Rule 48 "are to ensure speedy trial for criminal defendants, to relieve congestion in the trial court, to promptly process all cases reaching the courts, and to advance the efficiency of the criminal justice process." *Jackson,* 81 Hawai'i at 53, 912 P.2d at 84 (quoting *State v. Hoey,* 77 Hawai'i 17, 29, 881 P.2d 504, 516 (1994)) (quotation marks and ellipsis points omitted). To permit a defendant to relitigate

every motion that had already been decided by the trial court, albeit under a differently designated case number, solely because the case had been dismissed without prejudice for violation of the HRPP Rule 48 time limit and subsequently reinstituted by the prosecution would defeat all of the purposes sought to be achieved by HRPP Rule 48. Thus, we hold that Pulse was not entitled to relitigate his motion to suppress, and the circuit court did not err in denying his request for a continuance on that basis.

We recognize that there may be circumstances under which the defense will need extra time to prepare after a case is reinstituted by the prosecution following dismissal without prejudice for violation of HRPP Rule 48. For example, if the prosecution makes significant changes to the charges in the reinstituted complaint or indictment or includes additional charges therein, it might be necessary to allow extra time for the defense to prepare to meet the new or modified charges. *See United States v. Torres–Rodriguez*, 930 F.2d 1375, 1383 (9th Cir.1991) (holding that trial court erred in denying the defendant's request for a continuance where the "superseding" indictment added two years to the period during which the alleged conspiracy took place and included an additional count).

■■■■ In the instant case, the only difference between the two counts of the August 27, 1992 indictment and the parallel counts of the February 27, 1991 complaint concerned the HRS § 134–6(a) charge.[9] Because we have already decided that Pulse's conviction of the HRS § 134–6(a) charge must be re-

versed, we need only concern ourselves with whether the circuit court committed any reversible error with respect to Pulse's conviction of the HRS § 134–6(b) charge. Even if the circuit court had erred in denying Pulse's motion for a continuance because of the change to the HRS § 134–6(a) charge, any such error would be harmless beyond a reasonable doubt with respect to the HRS § 134–6(b) charge. *See Torres–Rodriguez*, 930 F.2d at 1384 (holding that there was "no need to reverse the convictions on the unchanged counts").

For these reasons, we hold that the circuit court did not reversibly err when it denied Pulse's motion for a continuance.

D. *The alleged prosecutorial misconduct does not require reversal of Pulse's convictions.*

■■■■ Pulse next alleges that there were several instances of prosecutorial misconduct during the course of his trial. We recognize that "[m]isconduct of a prosecutor may provide grounds for a new trial if the prosecutor's actions denied the defendant a fair trial." *Ganal*, 81 Hawai'i at 373–74, 917 P.2d at 385–86 (citing *State v. Agrabante*, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992)). *See also State v. Pemberton*, 71 Haw. 466, 476, 796 P.2d 80, 85 (1990) (citing *State v. Sugimoto*, 62 Haw. 259, 614 P.2d 386 (1980) for the proposition that "prosecutorial misconduct warrants reversal only where it prejudices defendant so as to deny him a fair trial"). Because Pulse did not object to the alleged misconduct at trial,[10] "[t]he conduct com-

9. Prior to the dismissal of the February 27, 1991 complaint, the prosecution had identified the underlying felonies of the HRS § 134–6(a) charge in the disjunctive ("by threats made in a common scheme against different persons; *or* with the use of a dangerous instrument" (emphasis in original)), whereas, in the August 27, 1992 indictment, the underlying felonies were specified in the conjunctive ("by threats made in a common scheme against different persons, *and* with the use of a dangerous instrument" (emphasis added)). This change, although minor, was not insignificant.

Pleading in the disjunctive is unacceptable because "it would leave the defendant uncertain as to which of the acts charged was being relied upon as the basis for the accusation against him

[or her]." *State v. Batson*, 73 Haw. 236, 250, 831 P.2d 924, 932 (1992) (quoting *State v. Lemalu*, 72 Haw. 130, 134, 809 P.2d 442, 444 (1991)), *reconsideration denied*, 73 Haw. 625, 834 P.2d 1315 (1992). Thus, the bill of particulars provided with respect to the February 27, 1991 complaint was faulty. The conjunctive pleading employed in the August 27, 1992 indictment, on the other hand, was appropriate. *See id.*

10. In one of the instances that Pulse now alleges constituted prosecutorial misconduct, Pulse objected on relevancy grounds. In another instance, Pulse made an objection on unspecified grounds, stating, "I think we're in an area we shouldn't be in," that was ruled on by the circuit court as if it were an objection based on attorney-client privilege. In neither instance, howev-

plained of must affirmatively appear to be of such a nature that substantial rights of the accused were prejudicially affected" in order to warrant reversal of his conviction. *Ganal,* at 376, 917 P.2d at 388 (citing *State v. Churchill,* 4 Haw.App. 276, 285, 664 P.2d 757, 764 (1983)). With this standard in mind, we consider each instance of alleged misconduct that Pulse has raised.

### 1. *"You have to kill somebody to get 15."*

During jury selection, the prosecutor engaged in the following exchange with one of the prospective jurors:

> [Prosecutor]: ... Have you or any close members of your family or close friend ever been involved in the criminal justice system, ever been to Court for criminal purposes?
>
> THE JUROR: .... I got a nephew who is right now in jail.
>
> ....
>
> [Prosecutor]: How much more time has he got?
>
> THE JUROR: Oh, I don't know.
>
> ....
>
> [Prosecutor]: ... [H]e no tell you, oh, I'm going to come out pretty soon, like tomorrow, huh?
>
> THE JUROR: They give him I think 15 years.
>
> [Prosecutor]: Fifteen?
>
> THE JUROR: Yeah.
>
> [Prosecutor]: You have to kill somebody to get 15.

■ Pulse contends that the prosecutor's statement that a person has to kill someone

to be sentenced to fifteen years constituted misconduct. Pulse has not proffered any explanation why this statement was inappropriate or how it prejudiced his right to a fair trial, and we can discern no readily apparent misconduct. Therefore, we will not consider it further. *See Jackson,* 81 Hawai'i at 46–47, 912 P.2d at 78–79 (when a party fails to present argument in support of a claim on appeal, it is our prerogative to disregard the claim).

### 2. *"... Mr. Pulse is locked up in custody ..."*

At the time of Pulse's arrest, Sandy had signed a written statement that Pulse had brought a gun onto Cartagena's boat. At trial, Sandy recanted the statement, alleging that it was untrue and that she had been "tricked" into making it. The prosecution sought to impeach her trial testimony by questioning her as to why she had not informed the authorities of the falsity of her statement sooner. In doing so, the prosecutor asked the following question:

> So you didn't think it was important because here Mr. Pulse is locked up in custody—important enough to come forward early to tell—ask for an interpreter to tell somebody all of this was a lie?

■ Pulse now alleges that the prosecutor committed misconduct when he referred to the fact that Pulse had been in custody. The record reveals, however, that Sandy had already testified to the fact that Pulse was in custody.[11] In addition, because of the context in which the prosecutor's reference to Pulse's custody arose there was virtually no

---

er, did Pulse allege that the prosecutor engaged in misconduct, move for a mistrial, or request curative instructions. Therefore, his conviction will not be overturned absent plain error. *See State v. Pinero,* 75 Haw. 282, 291 n. 4, 859 P.2d 1369, 1374 n. 4 (1993) (holding that even if an objection is made at trial, "if the grounds of error urged on appeal were not made in support of the objection below, we will not overturn the trial court absent plain error").

**11.** During the direct examination of Sandy by defense counsel, the following exchange took place:

> [Defense Counsel]: Do you see [Pulse] anymore?

A. *When he first went to jail,* I came to visit him. But after that, I was going to marry my fiancee, so I stopped going.

(Emphasis added.) Then, during cross-examination, Sandy testified as follows:

> I came because my ex-boyfriend didn't have a gun—didn't do anything like that. He didn't do anything to [Cartagena], and *he's in prison.* I feel sorry for him. Now, I'm going to get married, and I don't have a relationship with [Pulse] anymore. But I just have to help him because he did not deserve what he said he did.

(Emphasis added.)

possibility that the jury could have inferred anything about Pulse's guilt on the basis of the mere fact that he was in custody. *Cf. State v. Morishige*, 65 Haw. 354, 362, 652 P.2d 1119, 1126 (1982) (holding that jury's viewing of defendant in shackles "does not, ipso facto, raise a presumption of prejudice"); *see also State v. Jackson*, 8 Haw.App. 624, 633–36, 817 P.2d 130, 136–37 (1991) (holding that jury's viewing of a confidential informant leaving the witness stand, accompanied by identifiable security officers, was not inherently prejudicial to the defendant). Therefore, we hold that the prosecutor's reference to Pulse's being in custody did not constitute misconduct.

3. *"In fact, it's a misdemeanor offense. And you can get one year jail if you don't register your firearm."*

During Pulse's testimony on direct examination, he stated:

My gun is legal. I bought it when I was a correctional officer. It's registered with' the Federal Government. It may not be registered with—It is not registered with the State of [Hawai'i] here, but it's not essentially a crime to have a gun that is not registered as long as it's in your home, your place of business, or your sojourn.

Then, on cross-examination, the following transpired:

[Prosecutor]: I don't want to be a stickler, but you're not exactly right about not registering your firearm. When you bring a gun from anywhere—

. . . .

If you check the law—and maybe you have?

A. I have.

Q. Its 134–2 and three. Any weapon, pistol, especially firearm—revolver is what you've got?

A. Revolver, yes.

Q. By law has to be registered whether you buy it here or bring it in from the Mainland.[12]

[Defense Counsel]: I'm going to object because—

[Prosecutor]: He's telling the jury what the law is, I'm calling it to question.

[Defense Counsel]: I don't think it's relevant.

THE COURT: I think it was opened by Mr. Pulse when he testified about the Federal statute and what the statutes were about. So I'll allow the question.

THE WITNESS: My gun, as I said before or I thought I said, was brought in before I thought the law was passed. It's been kept in my home. And, you know, the law says you can have a gun in your home, place of business or sojourn. And it doesn't necessarily mean it's illegal if it's not registered.

BY [Prosecutor]:

Q. But I'm telling you it is. The statute is 134–2 and dash three. In fact, it's a misdemeanor offense. And you can get one year jail if you don't register your firearm.[13] You can check it out.

---

12. This assertion by the prosecutor was a correct statement of the law. Whenever a person comes to Hawai'i from out-of-state and brings a firearm with him or her, the firearm must be registered pursuant to HRS § 134–3(a) (Supp.1995), which provides:

Every person arriving in the State who brings or by any other manner causes to be brought into the State a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, shall register the firearm within three days after arrival of the person or of the firearm, whichever arrives later, with the chief of police of the county of the person's place of business or, if there is no place of business, such person's residence or, if there is neither a place of business nor residence, the person's place of sojourn; provided that no alien shall be al-

lowed to bring a firearm of any description into the State.

In addition, pursuant to HRS § 134–3(b) (Supp.1995), whenever a person in Hawai'i "acquire[s] the ownership," HRS § 134–2(a) (Supp. 1995), of a revolver, that person must register the revolver within five days of acquisition.

13. This assertion by the prosecutor was an incorrect, or at least somewhat misleading, statement of the law. Pursuant to HRS § 134–17(b) (Supp. 1995), "[a]ny person who violates section 134–3(a) shall be guilty of a petty misdemeanor," which is only punishable by up to thirty days in jail. HRS § 706–663 (1993).

On the other hand, at the time of Pulse's arrest, HRS § 134–17(c) (1993) provided that "[a]ny person who violates section … 134–3(b) … shall be guilty of a misdemeanor," which is

[Defense Counsel]: Excuse my interruption. But for purposes of the record, can we agree he's not charged with that? We don't want to confuse the jury. He's not charged with not having registered.

[Prosecutor]: Certainly not. But he seems to think it's perfectly okay to have an unregistered weapon.

[Defense Counsel]: Okay. I understand.

[Prosecutor]: And he's wrong.

THE DEFENDANT: It says it's essentially not a crime. As a matter of fact, I think I took copies and sent those to you out of the reference law library in OCCC.

BY [Prosecutor]:

Q. Well, later on, Mr. Pulse, your attorney can look at the statute. I have it right here, and you guys can talk about it. Is that okay?

A. Yes. I would like to do that.

 We agree with the circuit court that Pulse "opened the door" to questioning with respect to whether failing to register a firearm was an offense when he testified that "it's not essentially a crime to have a gun that is not registered as long as it's in your home, your place of business, or your sojourn." And although the prosecutor's statements were not entirely accurate, *see supra* note 13, the inaccuracy was insubstantial. Therefore, we hold that the prosecutor's questioning regarding whether Pulse's belief that his failure to register his revolver was not unlawful did not constitute misconduct.

4. *"Wasn't I the guy that took you through preliminary hearing?"*

 Pulse next alleges that the prosecutor engaged in misconduct when the prosecutor asked Pulse, "Wasn't I the guy that took you through preliminary hearing?" Pulse again fails to demonstrate how his right to a fair trial was prejudiced by this question.

punishable by up to a year in jail. HRS § 706-663. (HRS § 134-17(c) was amended in 1994 to make violation of HRS § 134-3(b) a petty misdemeanor. *See* 1994 Haw. Sess. L. Act 204, § 4 at 496-97.) However, according to Pulse's testimony, which the prosecutor was attempting to refute, Pulse did not violate HRS § 134-3(b) because he did not "acquire the ownership" of the revolver while in Hawai'i.

The only possible argument that we can surmise is that the reference to the prior proceedings could have had "the prejudicial effect of suggesting to the jury prior criminal activity." *State v. Kutzen*, 1 Haw.App. 406, 411-12, 620 P.2d 258, 262 (1980) (referring to prosecution's use of the term "mug shot" in context of previous photographic identification of a defendant).

This argument, however, is without merit. In light of the context in which the prosecutor's reference to the preliminary hearing was made, there was no possibility that a juror could infer that Pulse had been involved in any prior criminal activity. It was clear that the proceeding to which the prosecutor referred was a prior proceeding in the instant case. Therefore, we hold that the prosecutor's reference to the preliminary hearing did not constitute misconduct.

5. *"So that's why you keep changing lawyers. Are you satisfied with Mr. Beaman? . . . . Would you want to have me defending you? . . . . What about Mr. Beaman, your number one lawyer right now? Did you ever tell him that?"*

Finally, during the prosecution's cross-examination of Pulse, the following took place:

A. . . . . There's a lot of things that should have been done that I could have had done, but I did not know they were available to me. And that's another problem I have.

Q. So that's why you keep changing lawyers.[14] Are you satisfied with Mr. Beaman?

A. No, I'm not satisfied with Mr. Beaman. He knows that.

Q. Would you want to have me defending you?

A. I would think if it came down to it, between you and who else?

14. Pulse was originally represented by Deputy Public Defender Derrick Chan. In October 1991, Chan withdrew as Pulse's counsel, and James Beaman was thereafter appointed to represent Pulse.

Q. Schutter—David Schutter; Brook Hart—

THE COURT: [Prosecutor], move on to the next question.

THE WITNESS: I'd prefer Mr. Bailey or Horace Alice.

. . . .

Q. And then did you immediately tell your lawyer at the first opportunity you had that hey—

A. Yeah, I've told—I think it was Derrick Chan at that time. I told him a lot of these different things.

Q. What about Mr. Beaman, your number one lawyer right now? Did you ever tell him that?

 We agree that the prosecutor's obviously sarcastic questioning of Pulse regarding his dissatisfaction with his attorneys' performances "lacked the professionalism and decorum required of attorneys who practice before the bar of the courts of Hawai'i." *Ganal*, 81 Hawai'i at 377, 917 P.2d at 389. However, Pulse has not demonstrated how this indecorous questioning prejudiced his right to a fair trial. Moreover, we note that the questioning was far less egregious than any of the comments made by the prosecutor in *Ganal*, which we held did not require a new trial in that case. *Id.* at 376–77, 917 P.2d at 388–89. Thus, we hold that the questioning regarding Pulse's dissatisfaction with his attorneys' performances did not prejudicially affect Pulse's substantial rights and, therefore, does not warrant the reversal of his conviction.

### 6. *The cumulative effect of the alleged errors*

We recognize that there are situations in which "although no single prosecutorial act deprive[s] Defendant of a fair trial, the cumulative effect of the prosecutor's improper conduct [can be] so prejudicial as to deny him [or her] a fair trial." *Pemberton*, 71 Haw. at 476, 796 P.2d at 85. In the instant case, however, as discussed above, we have concluded that most of the acts challenged by Pulse did not involve any improper prosecutorial conduct. Furthermore, "[a]fter carefully reviewing the record, we conclude that

[because] the individual errors raised by Appellant are by themselves insubstantial[,] . . . it is unnecessary to address the cumulative effect of these alleged errors." *State v. Samuel*, 74 Haw. 141, 160, 838 P.2d 1374, 1383 (1992).

### E. *There was sufficient evidence that Pulse violated HRS § 134–6(b).*

Pulse additionally contends that there was insufficient evidence presented at trial to support his convictions.

We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. . . .

"Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Jackson*, 81 Hawai'i at 46, 912 P.2d at 78 (quoting *State v. Pone*, 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995)) (brackets omitted).

Pulse's argument on this issue is not very clear. He appears to argue that there was insufficient evidence that he carried a firearm outside of his "place of business, residence, or sojourn," HRS § 134–6(b), because "Appellant, Office patrol officer Gaeta, and Appellant's girlfriend 'Sandy' testified that some minor shouting occurred on the date of the incident but that no weapon was observed or displayed."

 Unfortunately for Pulse, Cartagena testified that Pulse had carried a loaded firearm from Pulse's boat to Cartagena's boat. The testimony of one percipient witness can provide sufficient evidence to support a conviction. *See State v. Eastman*, 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996) (citing *State v. Ibuos*, 75 Haw. 118, 123, 857 P.2d 576, 578–79 (1993)). Moreover, "it is well-

settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses[.]" *Domingo v. State*, 76 Hawai'i 237, 242, 873 P.2d 775, 780 (1994) (citation and quotation marks omitted). Therefore, we hold that there was sufficient evidence to convict Pulse for the violation of HRS § 134–6(b).

F. *The circuit court committed reversible error when it excluded Aku's testimony during Pulse's hearing on his motion to suppress.*

Pulse argues that the circuit court's exclusion of Aku's testimony at his suppression hearing violated his due process right to a fair hearing. The resolution of this issue requires us to first examine the propriety of the warrantless seizure of the gun from Pulse's boat, before we address Pulse's specific argument on appeal.

1. *Warrantless Seizure of the Gun*

It is uncontroverted that Pulse resided on the boat where the gun was seized, and, therefore, that Pulse had a legitimate expectation of privacy in his boat protected by the fourth amendment to the United States Constitution and article 1, section 7, of the Hawai'i Constitution, against unreasonable searches and seizures. *Cf. State v. Paahana*, 66 Haw. 499, 504, 666 P.2d 592, 596 (1983) (holding that defendant had legitimate expectation of privacy in laundry room near defendant's home); *Alward v. State*, 112 Nev. 141, 912 P.2d 243, 248–49 (1996) (holding that defendant had legitimate expectation of privacy in a tent located on a public campground). A warrantless search of a premises in which a defendant has a legitimate expectation of privacy is presumptively unreasonable. *State v. Lopez*, 78 Hawai'i, 433, 442, 896 P.2d 889, 898 (1995); *see also State v. Wallace*, 80 Hawai'i 382, 393, 910 P.2d 695, 706 (1996). "The [prosecution] has the burden of overcoming [the] initial presumption of unreasonableness by proving that the search falls within one of the well-recognized and narrowly-defined exceptions to the general warrant requirements[.]" *Lopez*, 78 Hawai'i at 443, 896 P.2d at 899 (quoting *Paahana*, 66 Haw. at 504, 666 P.2d at 596); *see also*

*Wallace*, 80 Hawai'i at 393, 910 P.2d at 706. One such well-recognized and narrowly-defined exception to the warrant requirement "occurs when the government has probable cause to search and exigent circumstances exist" necessitating immediate police action. *State v. Clark*, 65 Haw. 488, 494, 654 P.2d 355, 360 (1982) (citations omitted).

"Probable cause [to search] exists when the facts and circumstances within one's knowledge and of which one has reasonable trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed." *State v. Navas*, 81 Hawai'i 113, 116, 913 P.2d 39, 42 (1996) (citation omitted). We hold that Cartagena's identification of Pulse as the person who terrorized him with a gun gave the officers sufficient probable cause to believe that Pulse had committed a crime.

We next consider whether exigent circumstances justified the warrantless entry and seizure of the gun. The exigent circumstances exception

> exists when the demands of the occasion reasonably call for an immediate police response. More specifically, it includes situations presenting an immediate danger to life or serious injury or an immediate threatened removal or destruction of evidence. However, the burden, of course, is upon the government to prove the justification ..., and whether the requisite conditions exist is to be measured from the totality of the circumstances. And in seeking to meet this burden, the police must be able to point to specific and articulable facts from which it may be determined that the action they took was necessitated by the exigencies of the situation.

*Clark*, 65 Haw. at 494, 654 P.2d at 360 (internal citations, quotation marks, and brackets omitted).

In this case, the evidence presented at the suppression hearing (assuming that the evidence was properly adduced, *see section II.F.2.* of this opinion) clearly demonstrated that, based on the totality of the circumstances, Officer Mariani reasonably believed that Pulse posed an imminent dan-

ger to everyone in the vicinity. The record reveals that, upon arrival at the scene of the incident, Officer Mariani was informed that Pulse had just terrorized Cartagena with a gun and that Pulse appeared inebriated. Cognizant of these facts, Officer Mariani and the other officers walked to the finger pier outside Pulse's boat. From this vantage point, Officer Mariani peered into the cabin of the boat and saw Pulse sleeping with what appeared to be the butt of a handgun beside him. Mariani alerted the other officers, and when Pulse began to stir in his sleep, Mariani boarded the boat to secure the gun for the safety of Pulse, the officers, and the public. Based on these facts, particularly Officer Mariani's observation of Pulse stirring in his sleep with a gun within his immediate reach and control, the circuit court could have properly concluded that there were sufficient exigent circumstances present to justify the warrantless entry and seizure of the gun.

### 2. *Exclusion of Aku's Testimony*

■ The error in this case, however, emanates from the circuit court's decision to exclude Aku's proffered testimony at the suppression hearing. The due process guarantee of a fair trial under the fourteenth amendment to the United States Constitution and article 1, section 14, of the Hawai'i Constitution confers upon the accused in criminal proceedings "a meaningful opportunity to present a complete defense." *State v. Matafeo,* 71 Haw. 183, 185, 787 P.2d 671, 672 (1990) (citations omitted). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973).

15. HRE Rule 401 provides:

**Definition of "relevant evidence."** "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

16. HRE Rule 402 provides:

**Relevant evidence generally admissible; irrelevant evidence inadmissible.** All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United

■ The right to a fair hearing also extends to pretrial suppression hearings. *State v. Mitake,* 64 Haw. 217, 221–24, 638 P.2d 324, 327–329 (1981) (citations omitted). "Once it is determined that a pre-trial suppression hearing is warranted under the circumstances of a particular case, ... the due process clause requires that a defendant be afforded a fair hearing and a reliable determination on the issue of admissibility[.]" *Id.,* at 221–22, 638 P.2d at 327–28 (citation and internal quotation marks omitted). "However, a defendant's right to present relevant evidence is not without limitation and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *State v. Nizam,* 7 Haw. App 402, 410, 771 P.2d 899, 904–05 (1989) (citations and internal quotation marks omitted).

The prosecution contends that Aku's testimony and photographs were not relevant under Hawai'i Rules of Evidence (HRE) 401[15] and, therefore, were either inadmissible under HRE 402[16] or excludable as cumulative evidence under HRE 403.[17]

[D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Craft v. Peebles,* 78 Hawai'i 287, 293–94, 893 P.2d 138, 144–45 (1995) (quoting *Kealoha v.*

States and the State of Hawaii, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

17. HRE Rule 403 provides:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*County of Hawaii,* 74 Haw. 308, 319–20, 844 P.2d 670, 676 (1993), *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993)) (citations and quotation marks omitted). Accordingly, evidentiary decisions based on HRE 401 are reviewed under the right/wrong standard of review. *See, e.g., State v. Kupihea,* 80 Hawai'i 307, 314, 909 P.2d 1122, 1129 (1996) (citation omitted). Evidentiary decisions based on HRE 403, which require a "judgment call" by the trial court, are reviewed for an abuse of discretion. *See, e.g., State v. Kaiama,* 81 Hawai'i 15, 22, 911 P.2d 735, 742 (1996) (citation omitted).

■ Although the precise reason for the circuit court's decision to exclude Aku's testimony is unclear, it would appear that the court relied in part upon HRE 401 and 402 as the bases of its decision to exclude Aku's testimony. As discussed in *section II.F.1.* of this opinion, the exigency in this case stemmed largely from Officer Mariani's observing Pulse stir in his sleep with a gun in his immediate reach and control. Aku's testimony was directly relevant to contradict Officer Mariani's bare assertion that he saw Pulse with the gun inside the cabin. Accordingly, the circuit court erred to the extent that it may have concluded that Aku's testimony was irrelevant under HRE 401 and, therefore, inadmissible under HRE 402.

■ The prosecution claims that the court's exclusion of Aku's testimony was justified by HRE 403 because Aku's testimony is "cumulative" of the testimony of the officers who were present at the time of the search. In order for evidence to be considered "cumulative" for HRE 403 purposes, it must be substantially the same as other evidence that has already been received. *See Aga v. Hundahl,* 78 Hawai'i 230, 241, 891 P.2d 1022, 1032 (1995) (holding that one expert's testimony could be considered cumulative where "it did not offer a different opinion" than another expert's prior testimony); *State v. Klafta,* 73 Haw. 109, 115, 831 P.2d 512, 516 (1992) (holding that trial court did not abuse its discretion in admitting witnesses' testimonies over the defendant's objection that the testimonies were cumulative where the witnesses "each observed many of the same things, but they also observed some

things which were different"); *see also Monlux v. General Motors Corp.,* 68 Haw. 358, 363, 714 P.2d 930, 933 (1986); *In re Application of Hawaii Elec. Light Co.,* 67 Haw. 425, 430–31, 690 P.2d 274, 278 (1984). According to Pulse's offer of proof, Aku would have contradicted the officers' testimony. Therefore, we hold that the exclusion of Aku's testimony as cumulative under HRE 403 was an abuse of discretion.

■ The circuit court also stated in its ruling that Aku's testimony would not have affected the court's assessment of Officer Mariani's credibility because

> with respect to the testimony that Mr. Aku would have been able to provide, which is that virtually no one can see within this cabin area unless they are standing on the water, it would just raise an issue of credibility. And, again, this has to do with the person's ability—one particular person's ability to see, Officer Mariani, in the night in question. And Mr. Aku apparently has not been at the scene during the evening hours so that he would be able to make that statement with respect to the conditions at night as opposed to during the day.

As we have noted, in a suppression hearing, due process requires that a criminal defendant be afforded a fair hearing and a reliable determination on the issue of the admissibility of the evidence. *Mitake,* 64 Haw. at 221–22, 638 P.2d at 327–28. Therefore, at minimum, the court must remain impartial and refrain from assessing a witness's credibility until *after* that witness has testified.

■ In the instant case, the court appears to have found that Officer Mariani's testimony was credible *prior* to hearing Aku's proffered impeachment testimony. Based on this finding, the court erroneously declined to hear Aku's proffered testimony. Accordingly, we hold the circuit court's refusal to allow Aku to offer relevant testimony in support of Pulse's motion to suppress violated Pulse's due process right to a fair hearing.

■ We take this opportunity to also clarify the proper use of an offer of proof. As indicated above, the court erroneously opted to exclude Aku's testimony following

Pulse's offer of proof on the basis that the proffered testimony "would just raise an issue of credibility." This ruling reflects a serious misunderstanding of the purpose of an offer of proof, which is to provide an adequate record for appellate review and to assist the trial court in ruling on the *admissibility of evidence*. 1 Wigmore, Evidence § 20(a) (Tillers rev.1983); *see Kelekolio*, 74 Haw. at 522–23, 849 P.2d at 78. Therefore, the court's determination on an offer of proof is limited to the issue of whether the proffered evidence is relevant and admissible, not whether a witness may or may not be credible.

There being no other cogent grounds for its exclusion, we hold that the circuit court erred in excluding Aku's proffered testimony.

### 3. The Error Was Not Harmless Beyond A Reasonable Doubt

 Because of the circuit court's error in excluding Aku's testimony at the suppression hearing, we must determine whether the error affected Pulse's substantial right to a fair trial. We have held that "[t]he exclusion of competent testimony designed to impeach the credibility of a material witness for the [prosecution] was error that infringed upon a constitutional right of the accused, and as such was presumptively prejudicial." *State v. Pokini*, 57 Haw. 26, 29, 548 P.2d 1402, 1405 (1976), *cert. denied* 429 U.S. 963, 97 S.Ct. 392, 50 L.Ed.2d 332 (1976) (citations omitted). The burden is on the prosecution to show that the error was harmless beyond a reasonable doubt. *State v. Caraballo*, 62 Haw. 309, 323, 615 P.2d 91, 100 (1980). In *State v. Holbron*, 80 Hawai'i 27, 904 P.2d 912 (1995), we explained that

> error is not be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Heard*, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. *See Yates v. Evatt*, 500 U.S. 391, 402–03 [111 S.Ct. 1884, 1892, 114 L.Ed.2d 432] (1991); *see also State v. Suka*, 79 Hawai'i 293, 300, 901 P.2d 1272, 1279 (App.1995) ("In applying the harmless beyond a reasonable doubt standard the court is required to examine the record and determine 'whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction.'") (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967)).

*Holbron*, 80 Hawai'i at 32–33, 904 P.2d at 917–18 (footnote omitted).

After reviewing the record in its entirety, we are not convinced that the error in this case was harmless beyond a reasonable doubt. We can only speculate as to whether the circuit court would have granted or denied the motion to suppress after hearing Aku's relevant testimony. Moreover, assuming that the court would have granted the motion and suppressed the use of the gun at trial,[18] the prominent use of the gun by the prosecution during the trial was clearly harmful. For example, during the prosecution's case in chief, the prosecution asked Cartagena, the only eyewitness who observed Pulse carrying the gun, if he recognized the gun. In response, Cartagena stated "Yeah, that looks like the weapon there, yes." Also, during closing argument, the prosecution argued:

> So, if [Pulse] pulled a gun and threatened [Cartagena], like [Cartagena] testified, that's terroristic threatening. The fact it was a gun in that threat makes it that other charge, [134–6(a)] for which he is charged. So, you have to consider both things. Did he threaten [Cartagena] and did he use a gun to threaten him. Did he

---

18. For the sake of this analysis, we assume that the circuit court would have granted the motion to suppress the gun if the court had allowed Aku to testify because the prosecution has failed to

show beyond a reasonable doubt that the court would have ruled otherwise. *See Caraballo*, 62 Haw. at 323, 615 P.2d at 100.

use a gun in the course of commencing the terroristic threatening. If the answer is yes then he is guilty of [134–6(a)].

[The 134–6(b) count] is commonly called a possessory offense or status offense which is called place to keep a firearm. As Mr. Pulse said, you can keep your firearm in your house or residence. You can take it to the firing range for practice. You can carry it with you, but it's got to be in a special container and it will be—the language will tell you that it's got to be in a closed container. So you can't have it you know, on your person.

. . . .

So, as I said, if in fact he did have a gun with [him] that night when he made the threats, then he's also violated [134–6(b)].

The Judge is not going to give you the guns and the bullets the same time I don't think. It's unfortunate—well, we just don't want anybody fooling around with the gun back there in deliberation. A gun with the bullets, right? But, it's a revolver so it's not that dangerous. But, if you look at the bullets and look at the cylinder where the bullets go in[,] you could check [Cartagena's] story.

Based on the foregoing, we hold that the circuit court's error in excluding Aku's testimony at the suppression hearing was not harmless beyond a reasonable doubt.

G. *The circuit court did not err when it excluded Aku's photographs during Pulse's hearing on his motion to suppress.*

Pulse finally contends that the circuit court erred when it excluded Aku's photographs during the suppression hearing. We disagree.

Subsequent to the circuit court's declining to allow Aku to testify, the defense introduced into evidence eleven photographs of Pulse's boat and the pier and finger pier where it was moored. Pulse testified that the photographs "fairly and accurately depict[ed]" how his boat and the pier and finger pier looked on the date of the incident. Although Pulse did not testify that these photo-

graphs were the ones that Aku had taken, at the hearing on Pulse's motion for reconsideration, the circuit court stated that "there [had] already been testimony concerning the photographs from the defendant when he took the stand" and later reiterated that, "with respect to the photographs that Mr. Aku would have been able to testify to, there [had] already been sufficient testimony from the defendant himself concerning these photographs as to various locations." At the hearing, Pulse did not contend that the circuit court was mistaken that Pulse's testimony concerned the photographs that Aku had taken. If, as the court's uncontested statements suggest, the photographs that Aku had taken were the ones that were subsequently admitted, Pulse has no legitimate complaint.

█ Moreover, even if the photographs that were admitted were not the photographs that Aku had taken, in light of Pulse's testimony that the photographs that were admitted "fairly and accurately depict[ed]" the scene, the court's failure to consider Aku's photographs could not have been error. In this context, we agree with the following argument made by the prosecution:

[I]f the investigator's pictures looked the same [as the photographs that were admitted], they were cumulative of [those] pictures. If the investigator's pictures looked different, they were inadmissible because they did not depict the scene as it looked at the time of the offense.

### III. CONCLUSION

█ We vacate Pulse's HRS § 134–6(b) conviction pending a suppression hearing to determine if the gun was legally seized. If the circuit court determines that the gun should not be suppressed, the HRS § 134–6(b) conviction shall be reinstated; if the court determines that the gun should be suppressed, the circuit court shall order a new trial.[19]

---

**19.** Because we have held that Pulse's conviction

of violating § 134–6(b) was supported by sub-

stantial evidence, *see section II.E.* of this opinion, we hold that a retrial of Pulse on that charge would not compromise Pulse's constitutional right against double jeopardy. *See State v. Malu-fau*, 80 Hawai'i 126, 135, 906 P.2d 612, 621 (1995); *Wallace*, 80 Hawai'i at 414 n. 30, 910 P.2d at 727 n. 30.