**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000090
23-APR-2015
08:26 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---


STATE OF HAWAI'I, Plaintiff-Appellant,
v.
KOALAUKANI I. RAMOS-SAUNDERS aka
Koalaukani Ramos-Saunders, Defendant-Appellee


NO. CAAP-12-0000090


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 11-1-0093)


APRIL 23, 2015


FOLEY, PRESIDING J., LEONARD AND REIFURTH, JJ.


OPINION OF THE COURT BY FOLEY, J.

Plaintiff-Appellant State of Hawai'i (**State**) appeals from the "Findings of Fact, Conclusion of Law and Order Granting Defendant's Motion to Suppress Evidence" (**Findings of Fact and Conclusions of Law**), entered January 13, 2012, in the Circuit Court of the First Circuit[1] (**circuit court**).

On appeal, the State contends the circuit court erred in granting the November 30, 2011 "Motion to Suppress Evidence" (**Motion to Suppress**) submitted by Defendant-Appellee, Koalaukani Ramos-Saunders (**Ramos-Saunders**).

---

[1] The Honorable Glenn J. Kim presided.

## I. BACKGROUND

On December 3, 2010 at approximately 7:19 a.m., the Honolulu Police Department (**HPD**) received a "dropped 911 call" from a number that was registered to Walter Rosskopf (**Rosskopf**). Rosskopf's address was listed as Unit B, 59-068 Kamehameha Highway (**Unit B**).

Two HPD officers, Officer Angela Montano (**Officer Montano**) and Officer Joseph O'Neal (**Officer O'Neal**) (together, **officers**), responded to the dropped call. The officers arrived at the scene about 7:39 a.m. They proceeded to Unit B and spoke with Paula Burgess (**Burgess**), who indicated she lived there. Burgess told the officers that Rosskopf used to live in Unit B, but that he had moved up the road to Unit A (**Unit A**). Unit A and Unit B are two individual stand-alone residences that are located approximately 750 feet away from each other. Burgess also told the officers that Rosskopf suffered from prostate cancer.

Based on the information received from Burgess, Officer Montano notified dispatch that they were relocating to Unit A. The officers did not question Burgess further or check Unit B to determine whether Rosskopf or anyone else was inside in need of assistance. The officers did not conduct any further investigation of Unit B. Instead, the officers went directly to Unit A.

Upon their arrival at Unit A, the officers knocked on the front door and received no response. They walked around the exterior of Unit A, calling out to anyone who might be inside, but again got no response. The officers reported no indications such as voices or perceived movement, which could have suggested that someone was inside Unit A. The officers did not see anyone inside Unit A at any time.

While walking around Unit A's exterior, the officers looked inside through an open window and saw what appeared to them to be the barrel of a firearm, with what looked like a "silencer" attached to the firearm, protruding from underneath a towel. The officers also observed that Unit A was in a state of "disarray," the glass sliding door was open, the two air-conditioners were in operation, and the lights were on inside.

Upon making the forgoing observations and continuing to receive no response to their calling out, from outside Unit A, to anyone who could be inside, the officers requested additional police units to assist them at the scene. They remained outside Unit A while they waited for the additional police units to arrive.

After approximately ten minutes, HPD Officer Nelson Tamayori (**Officer Tamayori**) arrived at the scene and Officers Montano and O'Neal briefed him as to the situation. Officer Tamayori then walked around Unit A's exterior and observed the purported firearm and silencer.

All three officers then discussed the situation and their observations and decided to enter Unit A. The officers did not obtain a warrant to enter and search Unit A nor did they attempt to obtain one.

Following their warrantless entry of Unit A, the officers conducted a search of Unit A's interior and subsequently found inside two rooms, behind closed doors, multiple marijuana plants and what appeared to them to be an "indoor marijuana grow" operation. At the time, no one was found or located in Unit A.

On January 20, 2011, Ramos-Saunders was indicted on one count of commercial promotion of marijuana in the first degree, in violation of Hawaii Revised Statutes (**HRS**) § 712-1249.4(1)(a) (2014 Repl.),[2] and one count of unlawful use of drug paraphernalia, in violation of HRS § 329-43.5(a) (2010 Repl.).[3]

---

[2]  HRS § 712-1249.4(1)(a) provides in relevant part:

> **§712-1249.4 Commercial promotion of marijuana in the first degree.** (1) A person commits the offense of commercial promotion of marijuana in the first degree if the person knowingly:
>
> (a)  Possesses marijuana having an aggregate weight of twenty-five pounds or more[.]

[3]  HRS § 329-43.5(a) provides:

> **§329-43.5 Prohibited acts related to drug paraphernalia.** (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who
>
> (continued...)

On November 30, 2011, Ramos-Saunders filed the Motion to Suppress requesting the court "suppress all evidence obtained as a result of the illegal entry, search and seizure of [Ramos-Saunders' Unit A] on December 3, 2010 and thereafter." Specifically, Ramos-Saunders maintained that "there was no objectively rational reason for Officer Montano to enter [Unit A] based solely on what is alleged to have been a 'dropped 911 call.'"

On December 15, 2011, the State filed a "Memorandum in Opposition to Defendant's Motion to Suppress Evidence," asserting that there was probable cause to search Unit A and that there was exigent circumstances that justified the officers' warrantless entry into Unit A.

On December 21, 2011, the circuit court held a hearing on the Motion to Suppress. The State called Officer Montano,[4] Officer O'Neal, and Officer Tamayori to testify to the circumstances that surrounded their search of Unit A. After the three officers gave their testimony, the circuit court reasoned that the police may have had probable cause upon viewing the firearm with the silencer through the window, but clarified that "it's probable cause to get a search warrant, not to enter the house without a warrant . . . ." Ultimately, the circuit court determined that no exigency existed and granted the Motion to Suppress.

On January 13, 2012, the circuit court reduced its decision to the written Findings of Fact and Conclusions of Law. On February 10, 2012, the State filed a notice of appeal.

## II. STANDARD OF REVIEW

Appellate courts review a circuit court's pretrial findings of fact under the clearly erroneous standard. State v. Naititi, 104 Hawai'i 224, 233, 87 P.3d 893, 902 (2004) (citing State v. Locquiao, 100 Hawai'i 195, 203, 58 P.3d 1242, 1250

---

[3](...continued)
> violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706-660 and, if appropriate as provided in section 706-641, fined pursuant to section 706-640.

[4]     Officer Montano changed her last name to "Zanella" before the hearing, thus, the hearing transcript refers to her as "Angela Zanella."

(2002)). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." Id. (internal citation omitted). Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (citation and internal quotation mark omitted).

Pretrial conclusions of law are reviewed under the de novo standard. Naititi, 104 Hawai'i at 233, 87 P.3d at 902; see State v. Kauhi, 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997) ("We review the circuit court's ruling on a motion to suppress de novo to determine whether the ruling was 'right' or 'wrong'"). "A conclusion of law that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned." Dan v. State, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994) (citation and internal quotation marks omitted).

### III. DISCUSSION

A. Findings of Fact (**FOF**)

The State contends the following FOFs are clearly erroneous: 1, 4, 5, 7, and 10.

1. FOF 1

The State challenges the circuit court's FOF 1, which states, "Police information was that there was a landline telephone registered to Rosskopf at that address." The State contends FOF 1 is clearly erroneous because there is insufficient evidence to conclude that the 911 call came from a landline because the testimonies of Officer Montano and Officer O'Neal conflict with one another.

During the hearing on the Motion to Suppress, Officer Montano specifically indicated that she did not know whether the dropped 911 call came from a cellphone or a landline. In fact, she testified that she did not attempt to gather such information and could not recall whether anyone else had sought to determine

5

whether the call came from a landline. Unlike Officer Montano, Officer O'Neal was familiar with the origins of the call and twice testified that he believed the call came from a landline.

"[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." Inoue v. Inoue, 118 Hawai'i 86, 101, 185 P.3d 834, 849 (App. 2008) (citation and internal quotation marks omitted). Given Officer Montano's testimony that she did not have or could not recall information relating to the origin of the 911 call and Officer O'Neal's unequivocal belief that the 911 call originated from a landline, the circuit court did not err in adopting Officer O'Neal's testimony as credible. FOF 1 is not clearly erroneous.

2.    FOF 4

FOF 4 provides that "[t]he officers did not conduct any further investigation of the drop call at Unit B; they did not question Burgess further, nor did they check the house to determine whether Rosskopf or anyone else who might have been inside needed assistance. Instead they went directly to Unit A." The State contends that "[e]ven though the circuit court related at the hearing that it did not base its decision on what it thought should have been done, . . . the circuit court implicitly found that the officers should have investigated Unit B instead of Unit A in its [FOF 4]."

The record indicates that the circuit court thought the officers should have done a more thorough investigation of Unit B before proceeding to Unit A. However, the circuit court made it clear that its decision to grant the Motion to Suppress was not based on the fact that the officers failed to investigate Unit B. During the December 21, 2011 hearing, the circuit court stated

> They made a mistake. They went looking for [Rosskopf], when they should have, in the Court's view, done a further investigation from where the call originated which was why they were sent out there, why drop calls and open lines are so crucial, et cetera. It was because it originated at Unit B and they did no further investigation there.
>
> They made a mistake. All they heard was [Rosskopf], so they went looking for him when [Burgess] said he lives up there, when they should have done a further investigation of

> where the call originated, at Unit B. <u>I'm not going to grant the motion based on that, but they clearly made a mistake</u>.

(Emphasis added.) The circuit court then orally granted the Motion to Suppress and again stated

> And like I said, I think it's very clear to me that [the officers] made a mistake by going to Unit A and following the name rather than following the source of the call, because this whole thing started because of drop/open 911 call. And, you know, it's so potentially serious, et cetera, well, then you got to stick with where the phone, which they didn't do there and they got kind of confused there. And I can kind of understand that, but that's what they did. But I'm not, you know, <u>I'm not granting the motion based on that either</u>.

(Emphasis added.)

The circuit court granted the Motion to Suppress based on its finding that the officers were not faced with an exigent circumstance so to justify a warrantless entry into Ramos-Saunders' Unit A and not because the officers failed to investigate Unit B. The circuit court agreed that the officers faced a "suspicious" situation, but could not "see how by any stretch of the imagination they had specific and articulable facts to show them that there was an imminent danger to life such that [the officers had] to go into the house." The State's challenge to FOF 4 is without merit.

3.   FOF 5

FOF 5 provides:

> 5.   Upon their arrival at Unit A, the officers knocked on the front door and got no response. They then walked around the exterior of the house, calling out to anyone who might be inside, but again got no response. The officers reported no indications such as voices or perceived movement coming from inside the house which could have suggested to the officers that anyone was inside the house at that time. Nor did they at any time see any person inside the house.

The State argues that "this jurisdiction has recognized that 'a search is not . . . made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success.' [State v. Bonnell, 75 Haw. 124, 137, 856 P.2d 1265, 1273 (1993)] (internal quotation marks and citation omitted)." Thus, the State alleges that FOF 5

> is clearly erroneous insofar as the circuit court relied upon it in assessing the totality of the circumstances because it overlooks that it was objectively reasonable for the officers to believe that someone was inside the home at

> that time notwithstanding the fact that they could hear no voices or perceived movements within the home, or see any person therein.

The State does not dispute that no one was found within the home. Instead the State appears to contend that these facts should not have been included in the circuit court's FOFs because these facts were not relevant to the circuit court's ultimate determination as to whether it was objectively reasonable for the officers to enter the home.

The absence of a third person in the home was relevant to the extent that it indicated that the officers did not see a third person at any point before entering Unit A but, instead, relied on circumstantial evidence, such as the open glass sliding door and the presence of the firearm with a silencer, to form their opinion that someone was inside in need of assistance. FOF 5 is not clearly erroneous.

4. FOF 7

FOF 7 provides:

> 7. Upon making the foregoing observations, and continuing to receive no response to their calls from outside the house, the officers requested additional police units to assist them at the scene. They remained outside the house while they waited for the arrival of the additional police units.

The State alleges that FOF 7 "is clearly erroneous because it is an incomplete statement of fact." The State concedes that FOF 7 "is supported by substantial evidence," but still argues that the circuit court's finding is erroneous because it fails to acknowledge that the officers continued to call out for Rosskopf while they waited for Officer Tamayori to arrive as backup.

We have held that "[w]here an appellant alleges that the trial court failed to make adequate findings of fact, the appellate court will examine all the findings, as made, to determine whether they are (1) supported by the evidence; and (2) sufficiently comprehensive and pertinent to the issues in the case to form a basis for the conclusions of law. If those findings include sufficient subsidiary facts to disclose to the reviewing court the steps by which the lower court reached its ultimate conclusion on each factual issue, then the findings are

adequate." Nani Koolau Co. v. K & M Const., Inc., 5 Haw. App. 137, 140, 681 P.2d 580, 584 (1984) (internal citations omitted).

In the instant case, the circuit court's FOFs do not specify that the officers continued to call out to Rosskopf while they waited for Officer Tamayori to arrive. Such a finding, however, was not necessary. "The trial judge is required to only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." Rezentes v. Rezentes, 88 Hawai'i 200, 203, 965 P.2d 133, 136 (App. 1998) (quoting Doe v. Roe, 5 Haw. App. 558, 565-66, 705 P.2d 535, 542 (1985)). The circuit court included sufficient facts in its Findings of Fact and Conclusions of Law indicating that although the officers made repeated attempts to contact Rosskopf, no one inside Unit A responded to their calls. See Nani Koolau, 5 Haw. App. at 140, 681 P.2d at 584. FOF 7 is not clearly erroneous.

5.  FOF 10

FOF 10 provides:

10.  Following their warrantless entry of the house, the officers conducted a search of the house's interior and subsequently found, inside two rooms behind closed doors, multiple marijuana plants and what appeared to them to be an "indoor marijuana grow" operation. No person was ever found or located in the house at that time.

(Emphasis added.)

Similarly to the State's challenge to FOF 5, the State argues that FOF 10 is clearly erroneous, in part, because "although it is supported by substantial evidence, a mistake was clearly made insofar as the circuit court relied upon the fact that '[n]o person was ever found or located in the house [during the search]' in its assessment of the totality of the circumstances."

The record does not indicate that the circuit court relied solely on the absence of a third party in Unit A to justify its conclusion that no exigency existed. Instead, in granting the Motion to Suppress, the circuit court specifically noted that it also based its decision on the timing of the officers' decision to enter Unit A and the fact that the officers

did not see anyone inside before entering Unit A. The circuit court provided other sufficient facts to support its conclusion that no exigency existed, so we are not "left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." Daiichi Hawaii Real Estate Corp. v. Lichter, 103 Hawaiʻi 325, 337, 82 P.3d 411, 423 (2003). FOF 10 is not clearly erroneous.

B.   Conclusions of Law (**COL**)

The State challenges the circuit court's recitation of law in COL 5, which states:

> 5.    Exigent circumstances exist when "immediate police response is reasonably required 'to prevent imminent danger to life or serious damage to property, or to forestall the likely escape of a suspect or the threatened removal or destruction of evidence.'" State v. Vinuya, 96 Hawaii 472, 488, 32 P.3d 116, 132 (2001) (quoting State v. Lloyd, 61 Hawaii 505, 512, 606 P.2d 913, 918 (1980)).

The State also challenges COL 7, which concludes:

> 7.    Under the totality of the circumstances in this case, the police officers who conducted the warrantless entry and search of the house in question did not have specific and articulable facts which established an imminent danger to life or serious damage to property or the likely escape of a suspect or the threatened removal or destruction of evidence. In short, there were insufficient facts from which to conclude that there existed exigent circumstances justifying the warrantless entry and search of the house, and therefore such entry and search were illegal.

According to the State, COL 5 is incorrect because "an exigent circumstance is truly not just about an imminent danger to life, as explained by [State v. Lloyd, 61 Haw. 505, 606 P.2d 913 (1980)]." Instead, the State maintains that "an exigent circumstance generally exists 'when the demands of the occasion reasonably call for an immediate police response[,]' see [State v. Jenkins, 93 Hawaiʻi 87, 102, 997 P.2d 13, 28 (2000)], and thus includes situations where a person requires emergency aid, see [Michigan v. Fisher, 558 U.S. 45, 48 (2009)]." As a result of that reasoning, the State contends that COL 7 is also "clearly erroneous because it is based on facts that are cast in an incorrect light when the circuit court used a standard that obviously differed from that provided by the United States

Supreme Court in [Brigham City, Utah v. Stuart, 547 U.S. 398 (2006)], Fisher, and [Ryburn v. Huff, 132 S. Ct. 987 (2012)]."

The State cites to Brigham City, Fisher, and Ryburn in support of its emergency aid argument. These federal cases establish an "emergency aid exception" in the federal exigency analysis. See Brigham City, 547 U.S. 398; Fisher, 558 U.S. 45; Ryburn, 132 S. Ct. 987. The essence of the State's argument is that the circuit court erred in relying on established Hawai'i case law to determine whether exigency existed, instead of applying the federal exigency framework--a framework that Hawai'i has not adopted.

It is well settled that "[a]rticle I, section 7 of the Hawai'i Constitution affords the people of this state greater protection than does the fourth amendment of the United States Constitution." State v. Taua, 98 Hawai'i 426, 449, 49 P.3d 1227, 1250 (2002). The Hawai'i Supreme Court has noted that

> as the ultimate judicial tribunal in this state, this court has final, unreviewable authority to interpret and enforce the Hawaii Constitution. We have not hesitated in the past to extend the protections of the Hawaii Bill of Rights beyond those of textually parallel provisions in the Federal Bill of Rights when logic and a sound regard for the purposes of those protections have so warranted.

State v. Tanaka, 67 Haw. 658, 661-62, 701 P.2d 1274, 1276 (1985) (quoting State v. Kaluna, 55 Haw. 361, 369, 520 P.2d 51, 58 (1974)).

Under Hawai'i law, any warrantless search of a constitutionally protected area is presumptively unreasonable, unless "the government has probable cause to search and exigent circumstances exist necessitating immediate police action." State v. Pulse, 83 Hawai'i 229, 245, 925 P.2d 797, 813 (1996) (quoting State v. Clark, 65 Haw. 488, 494, 654 P.2d 355, 360 (1982)) (internal quotation mark omitted). The issue before use is whether the circuit court erred in determining that no exigency existed. See Lloyd, 61 Haw. at 512, 606 P.2d at 918 ("[T]he question of exigency is addressed to the factfinding function of the trial court, and its findings in that regard will not be set aside unless determined to be clearly erroneous.").

The Hawai'i Supreme Court has determined that an exigent circumstance

11

exists when the demands of the occasion reasonably call for an immediate police response. <u>More specifically, it includes situations presenting an immediate danger to life or serious injury or an immediate threatened removal or destruction of evidence</u>. However, the burden, of course, is upon the government to prove the justification . . ., and whether the requisite conditions exist is to be measured from the totality of the circumstances. And in seeking to meet this burden, the police must be able to point to specific and articulable facts from which it may be determined that the action they took was necessitated by the exigencies of the situation.

<u>Jenkins</u>, 93 Hawai'i at 103, 997, P.2d at 29 (emphasis added) (quoting <u>Pulse</u>, 83 Hawai'i at 245, 925 P.2d at 813); <u>see</u> <u>State v. Dorson</u>, 62 Haw. 377, 384, 615 P.2d 740, 746 (1980).

The State maintains "it was objectively reasonable for the officers to believe any one or all of the following scenarios in light of the totality of the circumstances confronting them: (1) that someone could have been injured from the gun they observed, was still within the home, and was unconscious from the injury; (2) suicide occurred within the home; or (3) someone entered the home, was in the process of burglarizing it when the police arrived, and, in burglarizing the home, Rosskopf or another person could have been in the unit at the time, thus creating a hostage situation."

The circuit court, however, determined that the facts did not give rise to an exigent circumstance so as to justify the officers' entry and search of Unit A without first obtaining a warrant. The circuit court noted during its hearing on the Motion to Suppress that the circumstances facing the officers appeared "suspicious," but did not rise to the level of indicating a need for immediate police intervention.

We agree. The officers arrived pursuant to a dropped 911 call and a tip that the call may have originated from a person who suffered from prostate cancer, which without further evidence does not in and of itself create exigency. The officers were only responding to one dropped 911 call that was received without any indication of a person being in duress or in need of immediate police assistance. <u>See cf.</u> <u>Pulse</u>, 83 Hawai'i at 246-47, 925 P.2d at 814-15 (finding that exigency existed to seize a gun in the immediate reach and control of defendant where the police officer was informed that defendant had just terrorized

another with the gun); see also U.S. v. Najar, 451 F.3d 710, 720-21 (10th Cir. 2006) (finding that exigency existed for police officer's warrantless search when the police received a dropped 911 call and subsequent calls back to caller were answered and then immediately hung up).

Upon arriving at Unit A, the officers observed that Unit A was in a state of "disarray" with the front door open, the lights on, and two air conditioners running so as to indicate that someone was home.  However, no one inside responded to the officers' repeated calls.  In fact, the officers never saw or heard a third person in Unit A nor did they witness any signs of a struggle that would indicate that someone was in danger or in need of immediate police intervention.  See Hannon v. State, 207 P.3d 344, 347-48 (Nev. 2009) (finding that a officer, responding to a 911 call for possible domestic disturbance, did not have an objectively reasonable belief to justify emergency entry into defendant's apartment when the officer did not witness any actual violence, did not see any evidence of an attack, and had no reason to believe another person was inside the apartment).  See cf. Jenkins, 93 Hawai'i at 103, 997 P.2d at 29 (finding that a warrantless seizure was reasonable where officer thought he was in danger because the passengers in a pulled over vehicle exhibited an unusual degree of movement and refused to obey the officer's orders to remain in the vehicle).

In addition, based on the totality of the circumstances, the presence of the firearm with a silencer did not create an exigent circumstance where there was no one near the firearm so as to necessitate its immediate removal.  See cf. Pulse, 83 Hawai'i at 246-47, 925 P.2d at 814-15 (finding that the officer's reasonable belief that defendant posed an imminent danger to public justified the warrantless seizure of defendant's gun that was within the defendant's immediate reach and control); see State v. Meyer, 78 Hawai'i 308, 314, 893 P.2d 159, 165 (1995) ("[N]o amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'").

The facts do not indicate that the officers were prevented from obtaining a warrant nor do the facts indicate that

the situation required immediate police action. The officers waited ten minutes for Officer Tamayori to arrive as back-up and the three officers had the opportunity to discuss the situation and their observations before deciding to enter Unit A. As the circuit court noted, these facts do not indicate the officers were faced with a situation that necessitated immediate intervention, but instead indicate the officers had the situation under control and the luxury of choosing when to enter Unit A. See State v. Vinuya, 96 Hawaiʻi 472, 490, 32 P.3d 116, 134 (App. 2001) (finding that no exigency existed for warrantless entry where police waited five hours before entering, had the luxury of choosing when to enter, and had sufficient time to obtain a warrant).

Under Hawaiʻi precedent, the totality of the circumstances indicate the officers were not faced with an "immediate danger to life or serious injury or an immediate threatened removal or destruction of evidence." See Jenkins, 93 Hawaiʻi at 102, 997 P.2d at 28. The circuit court did not err in determining that no exigency existed to justify the officers' warrantless entry into and search of Unit A.

## IV. CONCLUSION

Therefore, the January 13, 2012 "Findings of Fact, Conclusion of Law and Order Granting Defendant's Motion to Suppress Evidence," entered in the Circuit Court of the First Circuit is affirmed.

On the briefs:

Brandon H. Ito
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellant.

William A. Harrison
(Harrison & Matsuoka)
for Defendant-Appellee.