Electronically Filed
Intermediate Court of Appeals
CAAP-14-0001221
26-DEC-2017
08:40 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
KEVIN T. WILSON, Defendant-Appellant

NO. CAAP-14-0001221

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 14-1-0187)

DECEMBER 26, 2017

NAKAMURA, CHIEF JUDGE, AND FUJISE AND CHAN, JJ.

OPINION OF THE COURT BY NAKAMURA, C.J.

Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Kevin T. Wilson (Wilson) with first-degree terroristic threatening for committing terroristic threatening with the use of a dangerous weapon. The charge arose from an incident in which Wilson allegedly threatened to kill the complaining witness (CW), his then girlfriend, and lunged toward her while holding a knife. After a jury-waived bench trial, the

Circuit Court of the First Circuit (Circuit Court)[1] found Wilson guilty as charged. The Circuit Court sentenced Wilson to five years of incarceration.

On appeal, Wilson contends that: (1) the Circuit Court erred in admitting evidence which he claims was obtained as the result of an illegal search of his residence and his illegal arrest; and (2) without admission of the excludable evidence, there was insufficient evidence to support a guilty verdict, and therefore, his retrial should be barred by double jeopardy. We affirm Wilson's conviction and sentence.

BACKGROUND

I.

The State presented the following evidence at trial.

A.

In response to a 911 call, Honolulu Police Department Officers Douglas Dunkirk, Kendrick Noda, and Jason Akiona were dispatched during the evening to a residence in Kahalu'u. The officers were aware that a third party had reported an argument between a male and female at that location, and that the female had called the third party saying that she was scared. After the initial 911 call, the officers received several updates from dispatch. The officers were informed that a male and female were arguing, the female was afraid, a knife was involved in the argument, and that the male had the knife.

Upon arriving at the residence, Officers Dunkirk and Noda approached the front of the house while Officer Akiona went to the back door. All the officers were wearing their police uniforms. The front door to the residence was open and the screen door was closed. As they approached the front door, Officers Dunkirk and Noda could see Wilson in the house. The officers announced their presence and asked Wilson to step outside. Wilson refused and told the officer to "get the fuck away from my house." Officer Noda opened the screen door and

_____

[1] The Honorable Randal K.O. Lee presided.

2

directed Wilson to come out. Wilson complied, but continued to argue with the officers. Officer Dunkirk conducted a pat down of Wilson for weapons. No weapons were found, but Wilson remained agitated and continued to curse at the officers.

Meanwhile, as Officer Akiona was making his way to the back of the house, he could hear a female crying. When he reached the back door, Officer Akiona could still hear the female crying. He called out to the female to try to get her to come to him, but received no response. After determining that Wilson was out of the house, Officer Akiona entered the house through the back door. Upon entering, he continued calling out to the female, saying "police . . . where are you?" Officer Akiona heard crying and sobbing, but did not receive a response to his calls. Officer Akiona followed the sounds he heard to a locked door in a hallway. He knocked on the door, announced "police," and said, "it's okay, you can open the door."

At that point, the CW, holding a baby, opened the door and came out of the bathroom; "[s]he was crying, she was afraid, she was shaken." The CW appeared to be "very scared" and was unable to speak in full sentences.

Officer Akiona testified that when he entered the house, he did not have a search warrant or prior permission to enter. Officer Akiona explained that he entered the house without a warrant based on the following circumstances: The police had received a call that a female was possibly being harmed by a male, that a knife was involved, and "[n]ormally when someone says they're going to harm someone and they have a knife, we tend to think that there might be some type of injury that could occur." From his training and experience, Officer Akiona was aware that a search warrant takes over six hours to obtain. When the officers arrived at the residence, they observed the male, but not the female. Officer Akiona could hear crying from a female, but she did not respond to his call. Officer Akiona testified that he believed these circumstances constituted

"exigent circumstances" which required him "to make entry to insure the safety of the female and the child." Officer Akiona related that "[i]n a situation where there's possible domestic violence and someone says they're about to be stabbed," immediate action is necessary to "insure the safety and well-being of [the potential victim]."

After the officers spoke with the CW, Officer Noda located the weapons that the CW said were used during the argument, a knife and tire iron,[2] in the garage on top of a freezer. Officer Noda initially observed these items while standing outside the garage, and Officer Akiona recovered the weapons and submitted them into evidence.

## B.

The CW testified that at the time of the charged incident, she had been Wilson's girlfriend for three years. They had lived together on the mainland and in Hawai'i and were the parents of an 18-month-old boy. The CW testified that their relationship ended on the day of the charged incident and they were no longer together.

According to the CW, on the evening in question, she returned home with her son after visiting her mother in the hospital. Wilson was "sprawled out" on their bed and smelled of alcohol. The CW put her son, who had fallen asleep, on the bed next to Wilson and went back outside. There were two cars parked outside, both owned by the CW: a white SUV, which the CW drove, and a Lexus sedan, which Wilson drove. The CW opened the door of the Lexus sedan and saw an empty condom wrapper on the floor. The CW thought "not again" as the condom wrapper was not the brand that they used.

The CW confronted Wilson with the condom wrapper, and she told Wilson that he would need to find another place to stay and that she would be selling the Lexus sedan. Wilson replied, "[O]kay, whatevers, I'm going back to bed." The CW proceeded to

---

[2] The tire iron was an x-shaped, crossbar type of tire iron.

post the Lexus sedan for sale on craigslist. She received immediate responses and made arrangements to show the car to a prospective buyer that evening. The CW left the house driving the Lexus sedan and also took Wilson's cell phone.

On the way to meeting with the prospective buyer, the CW stopped at the 7-Eleven in Kahalu'u to clean out the car. As she was cleaning the car, the CW received a call from Wilson, who was angry. Wilson said, "[B]itch, where's my motherfucking car . . . . [Y]ou better get home . . . I'll kill you and I'll tear up this house and destroy the house and destroy your car." The CW was "very afraid" because of the threatening tone of Wilson's voice and because her son was at home with Wilson.

The CW told Wilson that she was coming home right away and began driving home. As she drove home, the CW called her father (Father), who was employed as a deputy sheriff, to let him know what was happening and the threats Wilson had made. The CW told Father to stay on the cell phone in case anything happened to her because she would not have the chance to call the police. She also told Father that she was going to hide the phone in her shirt and keep it on speaker phone so he could hear what was happening to her.

When the CW arrived home, Wilson was already outside. The CW parked the Lexus sedan, turned the engine off, and began to exit the vehicle. Wilson came quickly toward her with a knife in his right hand and a tire iron in his left hand. The CW testified that "he had the knife and the [tire iron] and he came basically striding, lunging towards me." The CW stated, "I thought I was going to die. I thought he's really going to kill me this time because he was coming at me so quickly and he had the knife up." As Wilson lunged toward the CW with the knife and tire iron in his hands, he said, "[B]itch, I'll motherfucking kill you." The CW got back into the Lexus sedan and shut the door. She screamed, "[H]e has a knife, he has a knife," so Father could hear her.

The CW tried to lock the doors to the Lexus sedan, but could not locate the proper button. Wilson opened the door and pulled the key out of the ignition. Wilson was swearing at the CW and repeatedly said, "where the fuck were you, get out of my motherfucking car . . . [, and] [B]itch, I'll kill you and I'm going to destroy your car." The CW got out of the car, and she tried to defuse the situation and to have Wilson focus on something other than trying to kill her. The CW told Wilson to relax, to calm down, and that everything was fine.

Wilson kept swearing at the CW and pacing back and forth with the knife and tire iron in his hand. However, Wilson calmed down a little after the CW told him that she had just gone to 7-Eleven to get something to eat, but came right back when he called. While Wilson remained outside, the CW went into the house to check on her son. She locked the front door and she locked the bedroom door where her son was sleeping because she was afraid Wilson would try to come in the house and kill her and her son. The knife that Wilson had threatened the CW with was a kitchen knife that was part of a knife set they kept in the kitchen. When the CW went into the house, she saw the other knives still in their proper "brick" slots, grabbed as many as she could, and hid them around the house so she could protect herself if necessary.

When Wilson tried to enter the house through the front door, the CW told him she would not let him come in with the knife. Wilson eventually opened the door with a set of keys he had, but apparently left the knife outside. While in the house, Wilson and the CW continued to argue, which woke up their son, who started screaming and crying because he was locked in the bedroom and could not open the door. Wilson and the CW then turned their attention to getting their son out of the bedroom, which required removing the doorknob. While Wilson was working on removing the doorknob, the CW saw police vehicles approaching the residence. As soon as the bedroom door was open, the CW

grabbed her son, ran to the bathroom, and locked the door. She removed everything from under the bathroom sink and told her son to get under the sink. The CW then sat on the ground with her back against the door to prevent Wilson from coming in. The CW did not leave the bathroom until a police officer knocked on the bathroom door.

Father's testimony corroborated the CW's account of the incident. Father testified that while he was visiting his wife at the hospital, he received a call from the CW. The CW was excited and upset, and she told Father that "[Wilson], he's going crazy. . . . [H]e's going to smash my car, he's going to smash the house. [My son] is at home." The CW said she was on her way home, and she told Father that she was going to hide her cell phone in her bra. The CW told Father to call 911 if anything happened. With his phone, Father stayed on the call with the CW. He used his wife's phone to call 911, and he explained the situation to the 911 dispatcher and gave the dispatcher the CW's address.

Father subsequently heard Wilson yelling that "he's going to smash the car, . . . he's going to smash the house, he's going to break up everything, he's going to kill [the CW]." Father described Wilson's tone of voice as "[a]ngry, crazy, just going nuts." Father called 911 again. While on the phone with the 911 dispatcher, Father heard his daughter through the other phone yelling, "[W]hat are you doing with the knife, oh, no, Daddy, he's coming at me with the knife, he's got a knife, [Wilson], put the knife away, put the knife away. . . . What am I going to do, Dad, he's going to kill me, Dad, what am I going to do?" Father asked the 911 dispatcher whether she heard what the CW had said, and the dispatcher said she heard it. Father told the CW to leave and run to Father's house, which was down the road.

II.

Wilson testified in his own defense. According to Wilson, on the day of the incident, he returned home in the early evening. While he was laying down in the bedroom, the CW angrily confronted him with an empty condom package. Wilson told the CW, "don't start this. You don't even know what you're talking about. There's nothing going on," and then he went back to sleep. The next thing Wilson heard was the CW speeding off in his Lexus sedan. When he could not locate his phone, he "knew [the CW] had taken it." He found another phone and called the CW who said she was at the 7-Eleven checking his car "for evidence of you fucking with bitches[.]" The CW told Wilson that she was going to call every number in his cell phone until she found out with whom he was having sex and that he needed to leave her house.

Wilson decided that it might be a good idea if they took "a little time-out" in their relationship. So he called the CW back and told her, "if you want me to leave, go ahead and bring my car back. I'll pack up my stuff, and I'll go ahead and leave and take a little bit of a break, if that's what we need to do." Wilson denied threatening the CW or threatening to destroy the house, things in the house, or the CW's SUV.

When the CW returned home, she kept the engine running with the lights on and her foot on the brake. Wilson asked the CW if she wanted to run him over, tear up the house, or tear up his car, and he reminded her that their son was sleeping upstairs, right above the garage. According to Wilson, the CW said that she just wanted to tear up the car. In response, Wilson went to look for something the CW could use to "tear up the Lexus [sedan] without tearing up the garage." He found a knife on top of his "rag box where [he] cut up the rags" and a tire iron.[3] He placed the knife and tire iron on the driver's

_____

[3] Wilson acknowledged that the knife, which he said he grabbed from the garage, was a "kitchen knife" that was from their kitchen.

seat of the other car (the SUV) and invited the CW to use them to "[h]ave fun" and damage the Lexus sedan. Wilson denied threatening to kill the CW. Wilson reached into the Lexus sedan, turned the engine off, put the car in park, and removed the keys.

The CW went into the house. After Wilson checked his car for damage and put the knife and tire iron back where he had found them, he used his key to enter the house. He checked on his son, who apparently was still sleeping, turned on the television, put food in the microwave, and accessed the internet through his computer. Wilson later heard a door slam and discovered that his son was locked in the bedroom. Wilson worked with the CW to unscrew the doorknob, and when the door was opened, the CW indicated she would take the child to the bathroom to wash up.

Wilson went to the garage to get some laundry. As he was reentering the house, he saw Officer Akiona running toward him and screaming for him to get on the ground. Because Officer Akiona was not in uniform and did not identify himself as a police officer, Wilson thought there was a "home invasion" being perpetrated. Wilson yelled at Officer Akiona to get off his property, and Wilson pulled the front screen door shut and locked it. Officer Noda then opened the back door and forced Wilson out the front door. Wilson said he overheard the CW telling the officers that she wanted to keep Wilson out of the house and the officers responding that their hands were tied unless Wilson did something to put the CW in fear of her life. The CW then told the officers that Wilson had a knife and the officers arrested Wilson.

### III.

The Circuit Court found Wilson guilty as charged. Among other things, the Circuit Court found that the CW's version of events was more credible than Wilson's, especially the CW's version regarding what transpired during their phone conversation while the CW was at the 7-Eleven and their interaction when the CW returned to the residence. The Circuit Court found and

9

concluded that collectively, the testimonies of the police officers, the CW, and Father "establish a logical and credible sequence of events," and the Circuit Court resolved "all issues of fact based on said testimonies."

At sentencing, the CW addressed the Circuit Court and stated that it has "been about eight months since the night Mr. Wilson threatened and attempted to kill me." The CW told the Circuit Court that the incident "still "haunt[s]" her, leaving her in constant fear for the safety of herself and her son. The CW stated that Wilson had threatened to kill her on several occasions and always emphasized that he would kill her if she ever called the police or reported him. The CW was fearful that if Wilson was released, he would harm her, her son, or her family. The CW reported that she had obtained a fifty-year restraining order against Wilson and that the family court had awarded her sole custody of their son with no visitation based on Wilson's violent criminal history[4] and "accounts of physical abuse and domestic abuse" against her. Based upon Wilson's violent criminal history and the violent nature of his terroristic threatening offense, the CW asked the Circuit Court to sentence Wilson to "the maximum sentence allowable by law."

The Circuit Court sentenced Wilson to five years of imprisonment. The Circuit Court entered its Judgment on September 29, 2014.

DISCUSSION

I.

Wilson contends that the Circuit Court erred in admitting evidence which he claims was obtained as the result of an illegal search of his residence and his illegal arrest. As explained below, Wilson is not entitled to relief on this claim.

---

[4] Wilson's criminal history included convictions for rape, battery against a correctional officer, and aggravated burglary.

A.

At the outset, we note that Wilson waived his right to challenge the admission of evidence on the ground that it was obtained as the result of an illegal search of his residence or his illegal arrest. Wilson did not file a motion before trial to suppress evidence on this ground.[5] See Hawaiʻi Rules of Penal Procedure (HRPP) Rule 12(b)(3) (2007) (identifying motions to suppress evidence as motions that must be raised prior to trial); HRPP Rule 12(f) (2007) (stating that failure to timely raise requests which must be made prior to trial "shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver").

In addition, Wilson did not object at trial to the introduction of any evidence, including the kitchen knife or tire iron recovered by the police, on the ground that the evidence was obtained as the result of an illegal search of his residence or his illegal arrest. Indeed, the first time the issue of the police's purported illegal search or arrest was raised at trial was during Wilson's closing argument. In Wilson's closing argument, his counsel stated: "Your Honor, first I'd like to argue that there's no probable cause for the arrest or the search that there should have been an arrest warrant obtained or a search warrant obtained. And I'll incorporate that in my

_____

[5] The record indicates that while Wilson was represented by his first appointed counsel, he sent correspondence to the Circuit Court that included a "Motion to Suppress," which Wilson apparently drafted, seeking to suppress evidence he claimed was obtained as the result of an illegal entry of his home and his illegal arrest. The Circuit Court advised Wilson that his correspondence constituted an impermissible ex parte communication with the Circuit Court and that it was sending his correspondence to his attorney. Subsequently, Wilson was appointed new counsel, who filed a Motion to Extend Pretrial Motions Deadline (Motion to Extend). In support of this motion, counsel filed a declaration representing that Wilson "recently has insisted" that counsel file a document that Wilson had prepared, which counsel attached as Exhibit A, but that counsel instead "would file a Motion to Dismiss in lieu of the document that Defendant prepared." The document attached as Exhibit A was entitled "Petition for Writ of Habeas Corpus" and sought to suppress evidence which was "the product of an illegal entry and illegal arrest[.]" However, at the hearing on the Motion to Extend, at which Wilson was present, the Motion to Extend was withdrawn, and the case proceeded to trial. The record does not show that Wilson ever actually filed a motion seeking to suppress evidence or requested that the Circuit Court rule on such a motion prior to trial.

11

arguments." However, counsel did not further address, elaborate on, or provide support for these claims in the remainder of his closing argument. Under these circumstances, we conclude that Wilson waived the claim that evidence obtained as the result of an illegal search or arrest was improperly admitted at trial. See State v. Hoglund, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) ("Generally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal."); State v. Ildefonso, 72 Haw. 573, 584, 827 P.2d 648, 655 (1992) ("Our review of the record reveals that [the defendant] did not raise this argument at trial, and thus it is deemed to have been waived."); State v. Moses, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[.]").

### B.

In any event, even if Wilson did not waive his illegal search or arrest claim, we conclude that Wilson is not entitled to relief on this claim. On appeal, Wilson claims that the search of his residence and his arrest were illegal because the police did not have a search or arrest warrant and there were no exigent circumstances justifying the search of his residence. In his opening brief, Wilson states that "[e]xigent circumstances exist when an immediate police response is reasonably required to prevent imminent danger to life or serious damage to property, or to forestall the likely escape of a suspect or the threatened removal or destruction of evidence." See State v. Lloyd, 61 Haw. 505, 512, 606 P.2d 912, 918 (1980). He contends, however, that there was no exigency to justify an exception to the warrant requirement,[6] and therefore, the police's entry into his residence was illegal.

---

[6] A general exception to the warrant requirement exists "when the government has probable cause to search, and exigent circumstances exist which advise against delay in proceeding to do so." State v. Clark, 65 Haw. 488, 494, 654 P.2d 355, 360 (1982). In his argument on appeal, Wilson does not address whether the police had probable cause to search his residence.

1.

The State counters that the police's warrantless entry into the residence was justified based on their "objectively reasonable basis for believing that medical assistance was needed, or persons were in danger." In support of its argument, the State cites federal cases that have recognized an emergency aid exception to the warrant requirement. See Brigham City v. Stuart, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."); Michigan v. Fisher, 558 U.S. 45, 49 (2009) (concluding that a police officer may make a warrantless entry into a residence where the officer has "an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger." (internal quotation marks and citation omitted)); Johnson v. City of Memphis, 617 F.3d 864, 867-71 (6th Cir. 2010). The State notes that the officers were responding to a domestic abuse 911 call, which heightened the potential that someone was injured or in danger due to the "combustible nature" of those situations. See Tierney v. Davidson, 133 F.3d 189, 197 (2d Cir. 1998) ("Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger."); United States v. Martinez, 406 F.3d 1160, 1164-65 (9th Cir. 2005). Here, the police had information that a domestic abuse 911 call had been received; that the female was afraid and that a knife was involved; Officer Akiona heard sounds of a female crying; and there was no response to Officer Akiona's calls into the house. If the CW had been stabbed, injured, or restrained by Wilson, the failure of the police to enter the residence without a warrant to assure the CW's well-being could have resulted in dire consequences to her.

2.

We note that in State v. Ramos-Saunders, 135 Hawai'i 299, 306, 349 P.3d 406, 413 (App. 2015), this court observed that Hawai'i had not yet adopted the federal "emergency aid exception" to the warrant requirement. Applying existing Hawai'i caselaw, we affirmed the trial court's finding that there was no exigency justifying the warrantless search and held that "the totality of the circumstances indicate the officers were not faced with an 'immediate danger to life or serious injury or an immediate threatened removal or destruction of evidence.'" Id. at 307, 349 P.3d at 414 (citation omitted). However, given the trial court's factual findings and our analysis on appeal, the circumstances presented in Ramos-Saunders would not have satisfied the federal emergency aid exception. We therefore do not read Ramos-Saunders as rejecting or precluding this court from adopting an emergency aid exception to the warrant requirement.

3.

For the reasons articulated by the United States Supreme Court in Brigham City for recognizing an emergency aid exception to the warrant requirement under the Fourth Amendment, we recognize an emergency aid exception to the warrant requirement under Article I, Section 7 of the Hawai'i Constitution. In doing so, we join numerous other jurisdictions which have recognized this exception. See Brigham City, 547 U.S. at 403; State v. Baker, 260 P.3d 476 (Or. 2011) (en banc); Commonwealth v. Gordon, 29 N.E.3d 856 (Mass. App. Ct. 2015); State v. Bennett, 351 P.3d 363 (Ariz. Ct. App. 2015); Mincey v. Arizona, 437 U.S. 385, 392 (1978) ("Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." (footnotes omitted)).

In Brigham City, the Supreme Court explained that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened

14

with such injury. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Brigham City, 547 U.S. at 403 (internal quotation marks and citation omitted). The Court therefore held that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id. "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." Fisher, 558 U.S. at 47. Rather, the test is an objective one that focuses on whether law enforcement officers had "'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." Id. at 49 (citation omitted).

Here, we agree with the State that given the information available to the police, Officer Akiona had an objectively reasonable basis for believing that medical assistance was needed, or that persons were in danger. As noted, the police knew that there had been a 911 domestic abuse call involving a male and female, in which the female was afraid and the male had a knife; upon arrival at the scene, the police located the male, but not the female; and Officer Akiona heard a female crying, but the female did not respond to his calls. Especially given the domestic violence context of the 911 call,[1] the police could reasonably have believed that the female did not respond to Officer Akiona's calls because she had been stabbed, injured, restrained, or was otherwise in critical need of assistance. We conclude that "[i]t does not meet the needs of

---

[1] Tierney, 133 F.3d at 197 (recognizing the combustible nature of domestic disputes and the need to give officers latitude in assessing whether one of the parties to the dispute was in danger); Martinez, 406 F.3d at 1164 (concluding that the "volatility of situations involving domestic violence make them particularly well-suited for an application of the emergency doctrine"); United States v. Lawrence, 236 F.Supp.2d 953, 961-62 (D. Neb. 2002) (noting that "[d]omestic abusers intimidate and control their victims" and citing statistics from a 1992 United States Supreme Court case that "'in an average 12-month period in this country, approximately two million women are the victims of severe assaults by their male partners.'" (citation and brackets omitted)).

law enforcement or the demands of public safety to require officers' to walk away from a situation like the one they encountered here." Id. Under the circumstances of this case, we conclude that Officer Akiona's warrantless entry into the residence was justified by the emergency aid exception to the warrant requirement.

C.

Finally, even assuming that the police's entry into the residence and Wilson's arrest were illegal, it would not affect the outcome of this case. On appeal, Wilson does not specify what evidence he contends was the excludable fruit of the alleged illegal search of his residence and his alleged illegal arrest. Presumably, Wilson challenges the admission of the kitchen knife and tire iron that were recovered by the police after they entered the residence.

However, the police's recovery of the kitchen knife and tire iron and the State's introduction of these items as physical evidence at trial was not important to the State's case. There was no dispute that Wilson possessed a kitchen knife and tire iron during the incident. Indeed, Wilson himself testified that he grabbed the knife and tire iron during the incident with the CW after she returned home from the 7-Eleven. The dispute at trial was over how these items were used. The CW testified that Wilson used these items to threaten her. Wilson denied threatening the CW with the knife or tire iron and instead testified that he offered these items to the CW so she could use them to damage his car. The introduction of the kitchen knife and tire iron at trial, items that are typically found at most homes, added little, if anything, to the strength of the State's case. Accordingly, there was no reasonable possibility that any erroneous admission of the kitchen knife or tire iron as physical evidence at trial affected the outcome of the case.

To the extent that Wilson challenges the admission of the CW's testimony as the excludable fruit of the alleged illegal search or arrest, that challenge is without merit. With respect to the suppression of derivative evidence, "the fruit of the

16

poisonous tree doctrine prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police." State v. Fukusaku, 85 Hawai'i 462, 475, 946 P.2d 32, 45 (1997) (internal quotation marks and citation omitted). "[N]ot all derivative evidence is inadmissible[.]" Id. Rather,

> [a]dmissibility is determined by ascertaining whether the evidence objected to as being the "fruit" was discovered or became known by the exploitation of the prior illegality or by other means sufficiently distinguished as to purge the later evidence of the initial taint. Where the government proves that the evidence was discovered through information from an independent source or where the connection between the illegal acts and the discovery of the evidence is so attenuated that the taint has been dissipated, the evidence is not a "fruit" and, therefore, is admissible.

Id. (block quote format altered; citation omitted). Thus, the pivotal question under the fruit of the poisonous tree doctrine is: "Disregarding the prior illegality, would the police nevertheless have discovered the evidence?" State v. Trinque, 140 Hawai'i 269, 281, 400 P.3d 470, 482 (2017) (internal quotation marks and citation omitted).

In this case, the answer to that pivotal question is clearly "yes." Here, the police knew about the CW and certain details regarding the alleged terroristic threatening before they entered the residence and arrested Wilson. At the CW's request, Father had called 911. Father's 911 calls disclosed that Wilson was arguing with the CW, that the CW was afraid, that a knife was involved in the argument, and that Wilson had the knife. More importantly, the CW, the victim of the charged terroristic threatening offense, was a cooperative and willing witness for the prosecution. The CW spoke willingly with the officers after Officer Akiona found her in the locked bathroom, later gave a recorded statement to the police, testified willingly at trial, obtained a fifty-year restraining order against Wilson, and at Wilson's sentencing, asked the Circuit Court to impose the maximum sentence allowable by law. The record plainly shows that disregarding the alleged illegal search and arrest, the police would nevertheless have independently discovered the CW's

testimony, the CW would have testified for the prosecution at trial, and any connection between the alleged prior illegality and the CW's testimony was attenuated.  Under these circumstances, the CW's testimony clearly would not have been subject to suppression under the fruit of the poisonous tree doctrine.  See United States v. Ceccolini, 435 U.S. 268, 274-79 (1978) (holding that the trial testimony of a witness was an act of her own free will and not subject to suppression under the fruit of the poisonous tree doctrine and observing that "[r]ules which disqualify knowledgeable witnesses from testifying at trial are . . . 'serious obstructions to the ascertainment of truth'" (citation omitted)); United States v. Brookins, 614 F.2d 1037, 1041-49 (5th Cir. 1980) (holding that a witness's trial testimony was not subject to suppression as the fruit of the poisonous tree because his testimony was attenuated from the illegal police conduct and the witness would have been discovered through ordinary police investigation); United States v. Leonardi, 623 F.2d 746, 751-54 (2d Cir. 1980).

II.

Wilson argues that without the evidence excludable under the fruit of the poisonous tree doctrine, there was insufficient evidence to support a guilty verdict, and therefore, his retrial should be barred by double jeopardy.  As established by our foregoing analysis, this claim is without merit.

CONCLUSION

We affirm the Circuit Court's Judgment.

On the briefs:

Andrew T. Park
for Defendant-Appellant

Stephen K. Tsushima
Deputy Prosecutingy Attorney
City and County of Honolulu
for Plaintiff-Appellee

18